IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| BEVERLY R. VOLK as Guardian for Jack Alan Schiering, a minor; and as Personal Representative of the Estates of Philip Lee Schiering and Rebecca Leigh Schiering, and on behalf of the statutory beneficiaries of Philip Lee Schiering; and BRIAN WINKLER, individually, | ) ) ) ) ) ) ) | No. 31814-1-III |
| | ) | |
| Appellants, | ) ) | PUBLISHED OPINION |
| | ) | |
| v. | ) ) | |
| | ) | |
| JAMES B. DEMEERLEER, as Personal Representative of the Estate of Jan DeMeerleer; HOWARD ASHBY, M.D. and "JANE DOE" ASHBY, husband and wife, and the marital community composed thereof; SPOKANE PSYCHIATRIC CLINIC, P.S., a Washington business entity and healthcare provider; and DOES 1 through 5, | ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Respondents. | ) ) | |

FEARING, J. — We undertake the humbling and daunting task of demarcating the duty a mental health professional owed to third parties to protect them from the violent behavior of the professional's outpatient client. The parties, the mental health care profession, and the residents of Washington State would be better served by the

legislature addressing this question after a comprehensive review of scientific data and statistics and after a thorough airing of the competing interests and policies involved. Since we conclude that the state legislature has not addressed the duty owed in the context of an outpatient client, we follow the Supreme Court precedent of *Petersen v. State*, 100 Wn.2d 421, 671 P.2d 230 (1983). We rule that a question of fact exists as to whether Dr. Howard Ashby and his employer, Spokane Psychiatric Clinic, P.S., owed a duty to protect the general public, including plaintiffs, from violent behavior of patient Jan DeMeerleer.

During the early morning of July 18, 2010, Jan DeMeerleer entered the home of his former girl friend, Rebecca Schiering, and killed her and her son Phillip. He attempted to kill another son, Brian, but left Phillip's twin, Jack, alive. Afterward, DeMeerleer killed himself. Prior to the killings, Jan DeMeerleer received outpatient treatment for his depression and bipolar disorder from psychiatrist Dr. Howard Ashby.

Brian Winkler, individually, and Beverly Volk, as guardian ad litem for Jack Schiering, and as personal representative for the estates of Rebecca Schiering and Phillip Schiering (collectively Schierings) brought suit against Dr. Howard Ashby and the clinic that he worked, Spokane Psychiatric Clinic, P.S., for professional malpractice, loss of chance, and negligence. The trial court dismissed the Schierings' action on summary judgment because Jan never threatened the Schierings in his sessions with Dr. Ashby.

2

To the extent the Schierings argue Dr. Howard Ashby should have involuntarily committed Jan DeMeerleer, we affirm the trial court's dismissal. We also affirm dismissal of the Schierings' lost chance claim and dismissal of the Schierings' claim of independent negligence against Spokane Psychiatric Clinic, P.S. But because a question of fact exists as to whether Dr. Howard Ashby owed a duty to protect the general public, including the Schierings, we reverse the dismissal of the claim against Howard Ashby for negligence in treating Jan DeMeerleer and the claim against Spokane Psychiatric Clinic, P.S. for vicarious liability and remand for further proceedings.

## FACTS

Since the Schierings claim Jan DeMeerleer's psychiatrist committed malpractice, we review DeMeerleer's psychiatric background. In response to the summary judgment motion, the Schierings provided the trial court with some of Dr. Howard Ashby's chart notes. We do not know if all notes were provided.

Jan DeMeerleer was born in 1971 and received his degree in mechanical engineering from Purdue University, where his bipolar disorder and depression first surfaced. He was hospitalized with suicidal thoughts and first diagnosed with the diseases during the summer of 1992. A mental health professional then placed DeMeerleer on Depakote, a medication that treats manic episodes resulting from bipolar disorder. DeMeerleer soon ceased taking the medication. He moved to the Midwest for education and jobs. He imbibed alcohol to treat his depression.

3

In 1996, DeMeerleer married Amy after living with her for three years. The two first met at a Moscow, Idaho high school where they graduated in 1989.

Jan DeMeerleer next sought treatment for his disorders in 1997, when he once again developed suicidal thoughts. A physician treated DeMeerleer on an outpatient basis and prescribed Depakote again. DeMeerleer ceased his sporadic use of the drug in 1998, because he disliked its side effects. The drug decreased his creativity. He was embarrassed for others to know he took antipsychotic drugs.

Jan and Amy DeMeerleer moved to Spokane in 2000, where their daughter was born that year. Amy, with the daughter, vacated the family home in 2003. The couple divorced in 2004 and agreed to share residential care of the daughter, exchanging her every four days.

Jan DeMeerleer sought psychiatric care from defendant Dr. Howard Ashby beginning September 13, 2001. His wife, Amy, attended Jan's first visit to Ashby. Dr. Howard Ashby obtained a history from his patient, Jan DeMeerleer. Ashby's 2001 intake notes contain the history recited above. The notes also read in part:

> September 13, 2001 Dr. Ashby Jan Demueller [sic] N/P Intake
> . . . .
> By August of 1998 after sporatic [sic] use [of Depakote] when he
> stopped it totally, he immediately went into a high and had "great feelings."
> He describes very much grandiose behavior. Over the past 2 years he has
> not received treatment and approximately 2 months ago quit his job in a
> grandiose manipulation and play at work where he basically states he made
> a fool of himself at work, said stupid things and engineered himself out of

4

the job in his delusional state thinking this was a grandiose thing to do. He states that earlier this summer he had suicidal ideation and even homicidal ideas, was going to leave the country. He states that in less manic situations he has a tendency to want to feel powerful, manipulates his wife, relatives and friends with stories. He indicates that at work he was so productive and good that at one time they even went along with his desire to be called by some fantastic name because he was so active and "gung ho". He states that last March he was grandiose to the point that he felt "I'm here to show earthlings what they are capale [sic] of". He indicates that as he looks back he recognizes that he was completely out of control.

In August of this year, his wife had to start working because he had quit his job. He started having some depression again and suicidal ideation including playing Russian Roulette. That gun and other weapons have been removed from the home and on Labor Day weekend he had an "intervention" with his family in which he invited them together and finally showed them the records of his previous hospitalization, etc., came clean with everything and asked for their support and help particularly to be able to help his wife when he gets into a manic or depressive swing.

Regarding mania, if he feels suicidal, it's to drive high speeds and hurt himself that way, regarding depression he states he is so immobile that he can't do it although he has had thoughts. He does describe 10 years ago however of being placed in the hospital because he laid down on railroad tracks with the idea of being decapitated.

. . . He was placed in jail at age 20 because of the train having to stop when he was trying to kill himself and was detained in the hospital. Subsequently, at age 21, while in college he was in jail for alcohol, stealing bikes and states it was during one of his out of control episodes during college.

**Mental Status Exam**: He is logical and goal oriented, somewhat labile [emotionally unstable] . . . . He expresses motivation to get help and to be compliant with medication at this time, however. His mood overall is neutral but again at times he can be very serious but not necessarily depressed but quite intense. Cognition is normal, content is good, judgment is intact. He is not suicidal or homicidal. No obsessions or compulsions. . . . Interaction with wife in this interview was appropriate.

Impression:

Axis I: Bipolar affective disorder with frank manic episodes but also apparently mixed presentations with a response to Depakote in the past but with poor compliance.

Axis II: A possibility of cyclothymic personality disorder and some obsessive compulsive traits which will all need to be further evaluated as time goes by and he further stabilized.

. . . .

Plan: Reinstitute Depakote, get blood level and baseline labs after he is on 500 mg twice a day for 4 or 5 days. Getting the medication at trough level were all described so he can get the level done appropriately. . . . I feel that having a fairly aggressive dose would be appropriate due to the description and seriousness of his symptoms and the possibility that he was only partially treated and this may have contributed somewhat to his difficulty with compliance. We will have to watch side effects to help with the compliance also. Set up additional appointments not only to monitor medication but to do therapy.

Clerk's Papers (CP) at 238-40. Cyclothymic personality disorder is a mild form of bipolar disorder, with meeker mood swings between depression and hypomania.

Dr. James Knoll, the Schierings' expert, averred in a declaration that he reviewed the clinical records from Spokane Psychiatric Clinic, P.S. In turn, Knoll included information in his declaration concerning Jan DeMeerleer's treatment, not included in the chart notes provided to the trial court. According to James Knoll, Jan DeMeerleer provided the following information, in a written submission, about his mental state when he first met with Dr. Howard Ashby in September 2001:

- Despises lesser creatures; no remorse for my actions/thoughts on other living creatures.
- Delusional and psychotic beliefs argued to the point of verbal abusive and fighting.
- No need for socialization; in fact, prefers to psychotically depopulate the world (i.e. "do Your Part" [CYP] terrorist philosophies).
- Wants to destroy; pounds on computer keyboard, slams phone receiver, swings fists.
- Has no use for others; everyone else in world is useless.

6

> - Reckless driving; no fear of danger in any circumstance, even "near misses."
> - Acts out fantasies of sex with anyone available.

CP at 85 (alteration in original).

On September 13, 2001, Amy DeMeerleer described her husband's mental states, according to James Knoll, as follows:

> - Makes mistakes on projects (i.e. breaking something) and quickly moves into dangerous rage; actually easily slips into depression after this type of trigger.
> - Severe lack of sleep coupled with dreams of going on killing or shooting sprees.
> - Drives automobiles very fast (at least 20 to 30 MPH above speed limit) without seat belt while showing no fear at all when in dangerous situations; applies even with child in car.
> - Expresses severe "road rage" at other slower drivers, even as a passenger (he's NOT driving).
> - Has an "All or Nothing" attitude; will actually verbally express "Live or Die!"

CP at 85-86.

Jan DeMeerleer expressed suicidal and homicidal ideas to psychiatrist Howard Ashby on several occasions after September 2001. But, according to Dr. James Knoll, Dr. Ashby made "no thorough inquiry . . . as to the nature and extent of [DeMeerleer's] ideas, such as: planning; access to weapons; prior attempts; acting out, etc; stress; access to victims; and so forth." CP at 86.

7

Jan DeMeerleer visited Dr. Howard Ashby on December 2, 2002. Dr. Ashby's notes for that visit read:

Jan indicate that he had an episode of approximately an hour, hour and a half of having angry, aggressive thoughts, even to the point of suicidal, homicidal thoughts, wouldn't act on them and it went as quickly as it came but on close questioning, he admits that during that period of time he was not checking himself or censoring those thoughts except not letting himself act on them. All told, there are some indications that he was still being responsible, i.e. he didn't want to leave because his daughter was sleeping etc. so there is an element of safety and keeping things under control that continue to be maintained. Mental status exam today is WNL [within normal limits] and he indicates that he is sleeping, doing fine, there is stress with his job as he has two job offers and now just has to wait to see which one comes through but he will be hired on permanently within the next month or two in one of the two jobs. This will be of great help to him. The last episode he had was in September which was approximately 2 months ago so we will have to keep an eye on this. It lasted about 3 hours, so hopefully the trend is that the medication is keeping things under control.
Plan: Take an extra Risperdal at the earliest onset, also use cognitive behavioral therapy principles that we've discussed prior and reviewed today.

CP at 241.

Jan DeMeerleer saw Dr. Howard Ashby on December 31, 2003. Dr. Ashby's chart notes read:

Jan missed his last appointment approximately 6 weeks ago, was in the middle of separating from his wife, totally spaced it out. Currently, however, he probably would not have made another appointment until some time in January but his family pressured him to get an appointment today. In the wake of the divorce, he was initially quite depressed, admits to having suicidal ideation, it walked through his mind, as he put it, but he would not take it seriously and has no intent, really feels like he could not do it. It actually bothers him that these kinds of ideas are entertained by

him from time to time. He became congruently upset and tearful because he states that those thoughts are totally untenable and unlike him and not something he would normally consider because of his daughter and other family members. He specifically documents how much support his family is and how much he knows he is cared about.

An additional negative, however, is that he started seeing a woman for approximately a 4 week period which was a very rewarding relationship, however, the last 2 weeks she has backed off and become more aloof indicating that there are a lot of little things about him as she got to know him that she didn't like and this really sent him for a loop because it's basically the same language his wife used, that there was not one thing but a lot of little things that caused her to divorce. We talked about these issues fully as time allowed and he was able to put things into perspective and already had in many ways. Additionally, however, he states that he does want to make some changes in things he knows are reasonable for him to make so we began a review of some target behaviors that he would like to work on.

Impression: Some emotional lability, but he has not had major symptoms that indicate that medication needs to be changed more than he needs psychological support. He has had depressive symptoms and has had some hypomanic behavior but in the context of the recent stresses, I do not see that the disorder itself is raising its head as much as the situation is creating the symptom response. With this in mind we're going to schedule a number of appointments in succession so that we can work on these issues and give him the support that he needs. I do not feel he is a suicidal risk. I also do not feel he is overly depressed or manic, either one which would cause him not to be able to continue to be functional at work, socially or in his family life at this point. Mental status, in that sense was euthymic in the sense of no push of speech, no rapid mood swings, thought content and production were all totally WNL.

CP at 237.

On January 23, 2004, Dr. Howard Ashby met with Jan DeMeerleer. Dr. Ashby's notes read:

Jan is still reeling from his wife divorcing him. He admits that he has had a lot of dark thoughts over the last couple of weeks. Talked about

this to some friends, they rallied around him and kept him okay. He apologized to them for being so negative, they were actually homicidal/suicidal thoughts. He indicates that reality check was appropriate and he is embarrassed that he had those thoughts and let himself get that carried away. He knows that he would never go there, but just the fact that he was expressing it out loud to other people is an embarrassment to him. We took a step back and looked at this to try to get a sense of perspective that might be helpful. One thing, is that he really does have strong feelings and this in a man who felt that at times he didn't have the ability to have deep feelings about things. Additionally, the fact that he talked with others and then they responded in a way that was appropriate, and as friends would do, was reassuring. As he has a tendency to look at the half empty side of the glass, we worked on this cognitive behavioral principle.

Mood, affect, psychomotor activity, content, insight, etc were all within normal limits. He does openly expresses [sic] the fact that he is in a lot of pain because of the sense of loss, but it is helpful to him that he has liberal visitation with his daughter who allows him to stay centered. The other five days he struggles. We worked on this also, so that he can have some counter statements to help with the tendency for negative interpretations.

Plan: Continue current medication, continue weekly support.

CP at 236.

According to Dr. James Knoll, Jan DeMeerleer, after divorce from Amy, told Dr. Howard Ashby of homicidal thoughts about his ex-wife and her boyfriend. The clinical notes in the record do not confirm such thoughts or reporting to Howard Ashby.

In 2005, Jan DeMeerleer met Rebecca Schiering and immediately fell in love with her. Schiering had three sons, Brian Winkler, and Phillip and Jack Schiering. Phillip and Jack, the younger boys, were twins. Jack experiences autism, bipolar disorder, and mood disorder. DeMeerleer eventually referred to the boys as his "children." CP at 196.

10

Phillip and Jack often called DeMeerleer "dad." CP at 196. DeMeerleer spoke often of marrying Rebecca Schiering and becoming a stepfather to her three sons.

On September 24, 2005, Gena Leonard, Jan DeMeerleer's mother, wrote to Dr. Howard Ashby expressing concerns about DeMeerleer's depression and homicidal thoughts. The letter read:

> Dr. Ashby:
> I am Jan's mother. And . . . I am very concerned about my son. I was in Spokane this past week, responding to a phone call from Jan's "significant other," Rebecca, a young woman who we all greatly admire. Rebecca's "Jan alarm" had gone off per his behavior and she wisely called in the troops . . . i.e., Jan's family. From what I understood of the Wednesday (Sept 21) visit, Jan gave his version of the recent events that prompted his parents and siblings to respond to Rebecca's appeal for help. I am certain you see through Jan's unrealistic reasoning but I am anxious to give you the "side" that we (his family) have experienced and observed.
> First of all, we are all concerned over Jan's obsessive occupation with money. . . . The latest events per the "beater" truck Jan was attempting to sell was strictly due to his driving need to get a high price for the vehicle. I believe this helped plunge Jan into a depressive mood. His recent statement of never wanting to see his daughter again, suggesting his companion, Rebecca, move out of his house, and announcing he was going to quit his job screamed depression to me.
> We were all extremely concerned that Jan's reaction to vandalism to his "beater" pickup truck was dangerous and unrealistic. Jan placed two powerful guns (a .357 pistol and a shotgun, both with lots of ammunition) into his car and then drove himself to the area where this theft had been perpetrated in order to "wait" for the thieves to return. Jan's two fathers (biological, and step-) and I do have a huge issue with Jan hauling loaded guns around in case he finds the guys who ripped into his truck! Jan assured us that he no longer has visions of suicide but that he has now progressed into a homicidal mode. Believe me, Dr. Ashby, we are NOT comforted by this information! Jan's several guns were removed from his home (by his two fathers) and taken to Moscow.

11

The recent events that prompted us to travel to Spokane are difficult to pinpoint since Jan has the ability to cover up his actions via his "stories." He is known in this family for his—to put it bluntly—"bullshit" and we all find it difficult to cut to the real truth. . . . He spends a lot of unhealthy time dwelling on his anger, hurt, and hatred towards his ex-wife and her boyfriend. I am not convinced he truly loved her but I think Jan's sense of absolute possession causes this outrage.

CP at 243.

On July 21, 2006, Dr. Howard Ashby visited with Jan DeMeerleer. Ashby's

office notes read:

Jan indicates that he is having a little bit of a period of time with being down and negative, needing increased sleep, even had some suicidal ideation. He used some extra Risperdal during this period of time and it knocked it right out, so he feels comfortable about keeping things under control. Actually, because of stresses at work, he would like to have a little bit of a manic episode if anything (tongue in cheek). Mood, affect, psychomotor activity; content, insight, etc. are all normal and he is doing well. We don't need to make any medication changes and he is doing a good job of managing things. I indicate to him, however, that if it's not just a minor change, he really should keep in touch with me so we can process it together. He was open to this but reassured me that this episode was not anything that needed to be concerned about.

CP at 235.

We are given no information about Jan DeMeerleer from summer 2006 to summer

2009. According to Dr. James Knoll, Jan DeMeerleer appeared distressed at the Spokane

Psychiatric Clinic, P.S., in June 2009. We do not know if DeMeerleer then spoke with

Howard Ashby or some other professional at the clinic. The clinic then changed his

12

medication types and dosages. But, according to Knoll, the clinic did not adequately plan follow-up care.

Rebecca Schiering became pregnant with Jan DeMeerleer's child in the fall of 2009. Both Schiering and DeMeerleer became excited at the prospect of a child together. In December, however, DeMeerleer slapped Schiering's autistic son, Jack, an event that caused estrangement between DeMeerleer and Schiering. Rebecca Schiering, with her children, moved out of DeMeerleer's home. Rebecca Schiering terminated the pregnancy.

In December 2009, Jan DeMeerleer telephoned Spokane Psychiatric Clinic, P.S. in distress over losing his employment and separating from Rebecca. DeMeerleer asked to return to counseling and medication management. The clinic referred him to local community based mental health clinics and told him to call back if the referrals did not succeed.

In January 2010, as the result of Jan DeMeerleer writing to his mother about difficulties with Rebecca Schiering, the mother, Gena Leonard, wrote an e-mail critical of Schiering to DeMeerleer. Schiering read the e-mail and her reading of the message sealed a temporary ending of the relationship between DeMeerleer and Schiering. Schiering concluded that Jan's family unfairly judged her and her sons. Schiering, in turn, did not wish to be part of Jan DeMeerleer's family.

13

Gene DeMeerleer is the brother of Jan. In January 2010, Gene visited with Jan at their sister's Spokane house. Jan appeared distressed and spoke of Rebecca Schiering's reading of the e-mail written by the brothers' mother. During the talk between the brothers, Jan expressed distress over the apparent ending of his relationship with Rebecca Schiering. Jan expressed no homicidal or suicidal thoughts.

Jan DeMeerleer's last appointment at the Spokane Psychiatric Clinic, P.S. occurred on April 16, 2010, when he again met with Dr. Howard Ashby. DeMeerleer told Ashby that he was mending his relationship with Rebecca Schiering. Dr. Ashby noted he had an unstable mood and intrusive suicidal ideas. But DeMeerleer assured Ashby he would not act on those thoughts. The Spokane Psychiatric Clinic, P.S. notes from April 16 read:

> Jan indicates that his life is stable, he is reconstituting gradually with his fiancé. They are taking marriage classes, he can still cycle many weeks at a time. Right now he is in an expansive, hypomanic mood, but sleep is preserved. He has a bit more energy and on mental status, this shows through as he is a bit loquacious but logical, goal oriented and insight and judgment are intact. He states when depressed he can get intrusive suicidal ideation, not that he would act on it but it bothers him. At this point it's not a real clinical problem but we will keep an eye on it.
> Plan: We will continue Risperdal, Depakote and Buproprion [sic].

CP at 234. Risperdal treats symptoms of bipolar disorder. Bupropion is an antidepressant.

As a result of Rebecca Schiering's comments about his family, Jan DeMeerleer had no contact with his mother, Gena Leonard, from January 25 to May 9, 2010, when

14

Jan gave his mother flowers for Mother's Day. During communications thereafter, Jan expressed to his mother love for Rebecca Schiering and her family. Leonard and DeMeerleer exchanged occasional e-mails after Mother's Day.

During May through July 2010, Jan DeMeerleer and Rebecca Schiering spoke of mending their relationship. DeMeerleer attended a family gathering at his father's cabin during a weekend in late June 2010. DeMeerleer was relaxed and spirited. His humor entertained family members.

On July 11, 2010, Jan DeMeerleer took his daughter to Amy DeMeerleer's home, and he left for New Orleans the following day. According to Amy, Jan appeared normal, other than seeming tired. He spoke positively about Rebecca Schiering and her children. During his trip to New Orleans, Jan sent Amy a number of texts. The texts were "light hearted" and caused Amy no concerns. CP at 156. Amy DeMeerleer saw Jan again on the morning of July 16, 2010, and Jan appeared neither despondent nor manic.

On July 16, 2010, Jan DeMeerleer called his sister, Jennifer Schweitzer, and reported that Rebecca Schiering broke up with him and the relationship was over for good. Schweitzer invited DeMeerleer to dinner that evening. DeMeerleer was depressed when he arrived for dinner. During dinner, he expressed sadness over the termination of the relationship. After dinner, Jan DeMeerleer walked with Jennifer Schweitzer's husband and his mood improved. By the time of leaving Schweitzer's home, DeMeerleer was laughing and normal.

15

On the morning of Saturday, July 17, 2010, Jan DeMeerleer, at the request of his neighbor, Brent Tibbits, cut down two trees in DeMeerleer's yard. The trees spread roots into the neighbor's yard. DeMeerleer's actions followed a 15 minute conversation with Tibbits. According to Tibbits, DeMeerleer was cooperative, coherent, and logical, and neither angry nor ecstatic.

During his trip to New Orleans in July, Jan DeMeerleer texted Darien Boedcher, a close friend he met at work in 2003. In the text, he told Boedcher how much he was enjoying his time in New Orleans. On the evening of July 17, 2010, DeMeerleer called Boedcher to ask about visiting one another, but Boedcher was out of town. According to Boedcher, DeMeerleer sounded normal during the call.

At 5:00 p.m., July 17, Jan DeMeerleer called his mother, Gena Leonard, and left a message on her phone answering machine. DeMeerleer's tone sounded normal. In the phone message, Jan stated, "'Hello. Long lost son Jan here, trying to get ahold of you. Seeing what's up on a sunny weekend. Hope you guys are out driving your Corvette. That's what you need to be doing. Anyhow, I'll be hanging out here at home. Feel free to give me a call when you get back. Thanks. Bye.'" CP at 172 (emphasis omitted).

Late July 17 or early July 18, 2010, Jan DeMeerleer entered the home of Rebecca Schiering. Present in the home was Rebecca and her three sons. Shortly before 3:00 a.m. on July 18, DeMeerleer entered the room where Brian Winkler, age 17, slept, and DeMeerleer slashed Brian's throat with a knife. Brian struggled with the bigger and

16

stronger DeMeerleer as DeMeerleer continued the attack on Brian. Brian received additional knife wounds. During the struggle, Brian screamed, awakening the family, which caused DeMeerleer, with a gun in hand, to leave the room and to proceed to Rebecca's room. Brian called for help with his cell phone and fled the home.

Jan DeMeerleer shot Rebecca Schiering as she entered the home hallway. DeMeerleer entered the bedroom of Jack and Phillip and shot Phillip who slept in the top bunk bed. Jack slept in the other bed but was physically unharmed. DeMeerleer left the home and drove away in his car. After observing DeMeerleer leave, Brian returned inside the home and discovered his mother lying in a pool of blood in the hallway. Brian desperately tried to help his wounded mother. He exited the home when police arrived. As he waited outside, Brian observed his mother removed from the house in a body bag. Brian was transported by ambulance to Sacred Heart Hospital. Phillip was also transported by ambulance and died later that day. Police later found DeMeerleer, in his home's garage, dead from a self-inflicted gunshot wound.

Family members, friends, and acquaintances who visited Jan DeMeerleer shortly before the incident gleaned no indication of any plan to kill someone or to commit suicide. Many expressed shock at the deaths. Toxicology reports showed DeMeerleer was not taking his medication at the time of the killings.

PROCEDURE

Brian Winkler, Jack Schiering through his guardian, and the Estates of Rebecca Schiering and Phillip Schiering (collectively the Schierings) sue Jan DeMeerleer's estate for wrongful death, personal injuries, loss of family members, and emotional harm resulting from the killings of Rebecca and Phillip and the attack on Brian. The claims against Jan DeMeerleer are not the subject of this appeal.

The Schierings also sue Howard Ashby and Spokane Psychiatric Clinic, P.S. for professional malpractice. They allege Dr. Ashby did not adequately assess DeMeerleer's suicidal or homicidal risk and provide treatment. The Schierings claim an adequate assessment and better care might have exposed DeMeerleer's homicidal thoughts about Rebecca, Phillip, and Brian. In turn, the Schierings allege Howard Ashby might have prevented the attacks by either mitigating DeMeerleer's dangerousness or warning Rebecca, Phillip, and Brian with enough time for them to protect themselves. The Schierings include an allegation of lost chance of survival.

The Schierings allege Howard Ashby was an employee of Spokane Psychiatric Clinic, P.S. The clinic agrees that Howard Ashby works for it, but denies an employer-employee relationship between the two. The Schierings further allege that Spokane Psychiatric Clinic, P.S. failed to establish or implement "practices, policies, procedures, training, supervision and directives reasonably necessary to provide appropriate medical

care to patients such as Mr. DeMeerleer when presenting with suicidal and/or homicidal ideation." CP at 31.

Howard Ashby and Spokane Psychiatric Clinic, P.S. moved for summary judgment, partly arguing they owed no third-party duty to anyone in general or the Schierings in particular. Ashby filed affidavits of friends and family of Jan DeMeerleer to establish the surprise nature of the assault, homicides, and suicide to argue the lack of foreseeability of the attacks. Howard Ashby wisely filed no affidavit from him or any professional to discuss the standard of care of a psychiatrist, since a battle between experts does not lend itself to winning a summary judgment motion. Instead, Dr. Ashby relied on the undisputed fact that Jan DeMeerleer did not threaten, in the presence of Ashby, Rebecca Schiering or her children.

In opposition to the summary judgment motion, the Schierings filed a declaration of expert, James L. Knoll, IV, M.D. Knoll is a board certified psychiatrist, professor of psychiatry at the State University of New York (SUNY) Upstate Medical University, and editor of *Psychiatric Times*. He specializes in forensic psychiatry. In his declaration, Knoll relates that he reviewed the clinical records of Jan DeMeerleer from Spokane Psychiatric Clinic, P.S., the investigation file of law enforcement, and the autopsy and toxicology reports regarding DeMeerleer. Knoll claims to be familiar with the standard of care of a psychiatrist in the State of Washington based on education, training,

19

experience, and consultation with a colleague in the State of Washington. According to

Knoll, the standard of care in Washington equates to the standard of care nationally.

Dr. James Knoll faults Dr. Howard Ashby, because, despite Jan DeMeerleer's

frequent mental instability, Ashby failed to conduct a systematic and focused assessment

of DeMeerleer's condition or prepare a treatment plan with periodic follow-up care.

Because of his previous homicidal and suicidal ideas, DeMeerleer required extended in-

patient psychiatric therapy and treatment.

In his declaration, James Knoll averred:

> During treatment by SPC [Spokane Psychiatric Clinic], DeMeerleer, after the failure of his first marriage, expressed homicidal ideas toward his former spouse and her then-current boyfriend. Subsequently, while in a relationship with Ms. Schiering, it was known that DeMeerleer's family, including his father and mother, were substantially concerned about his access to firearms, and his acting out homicidal ideas.

CP at 86.

According to Dr. Knoll, Dr. Ashby knew of Jan DeMeerleer's penchant for

refusing to take prescribed medications and should have taken steps to encourage and

monitor use of medications. Knoll criticizes Ashby for failing to provide care, when

DeMeerleer called in distress on December 1, 2009, because of loss of employment and

separation from Rebecca Schiering. Instead, Spokane Psychiatric Clinic, P.S. referred

DeMeerleer to a community-based mental health clinic. Knoll criticizes Ashby for

failing to adequately assess Jan DeMeerleer's suicide risk, during the last visit on April

20

16, 2010, and Ashby's reliance on DeMeerleer's self-report that he would not commit suicide. Ashby should have, at the least, scheduled a follow-up appointment to monitor DeMeerleer's condition.

According to expert witness James Knoll:

> Timely, appropriate, and focused psychiatric inquiry of DeMeerleer during clinical sessions most likely would likely have resulted in him having incurred more appropriate and intensive clinical or institutional psychiatric treatment. This until such time as treatment was demonstrably effective and/or risk of harm to himself had been appropriately mitigated. An adequate suicide risk assessment does not rely solely on the patient's denial of suicidal ideas, but involves an assessment of both the aggravating and mitigating factors in the context of the individual circumstances and patient's clinical status. A psychiatrist simply asking about suicide ideas does not ensure accurate or complete information will be received. It is considered the standard of care for the mental health professional to perform an adequate suicide risk assessment. A systematic assessment of suicide risk is a basic, essential practice that informs the mental health professional about proper treatment and management. It is pertinent that in clinical practice, it is observed that some patients, who first express suicidal ideas in clinical session, are found also to have homicidal ideas during risk assessment for suicide. Also, it is with unfortunate observed frequency that some who are known or believed to be suicidal, commit homicide, concurrent with suicide.

CP at 88-89.

In his declaration, Dr. James Knoll opined:

> . . . Given DeMeerleer's unstable BP, life stressors, past suicide attempts, past actions to realize homicide, noncompliance and "intrusive" suicidal ideas, it was below the standard of care to fail to monitor him in a timely manner. Had SPC met the standard of care, it is patent that DeMeerleer would have been in regularly scheduled clinical follow-up over the summer of 2010. During that period, and prior to the incident, an exchange of e-mails between DeMeerleer and Ms. Schiering reveal the

21

relationship had crumbled, and that DeMeerleer was emotionally crushed and mentally desperate and unstable. DeMeerleer's SPC records clearly demonstrate that he routinely raised and addressed issues pertaining to his current relationship during clinical sessions. This is evident in his early SPC records, first in his and his then-current spouses' attempts to remain together, and then on to his dark, intrusive homicidal thoughts toward her, and her new interest. DeMeerleer's following relationship with Ms. Schiering was then substituted as a clinical topic. Had DeMeerleer been in clinical session during the summer of 2010, SPC would have been able to inquire about his thoughts and emotions about his current relationship with Ms. Schiering and her children, and any ideas of suicide and/or homicide. Recall that DeMeerleer had disclosed suicidal and homicidal ideas during several prior clinical sessions. Had SPC properly monitored DeMeerleer, resulting in an adequate risk assessment for suicide and/or homicide, intensive clinical or institutional psychiatric treatment, the risk and occurrence of the incident would have been mitigated, and probably would not have occurred, as DeMeerleer's mental distress probably would not have digressed to the level of allowing for an act of suicide and/or homicide.

10. To the extent that DeMeerleer's potential for harm to self or others could not be reasonably mitigated by psychiatric treatment, including institutional treatment, proper inquiry and assessment may have substantiated that Ms. Schiering and her children were foreseeably at risk of harm from DeMeerleer. Had this occurred, given proper caution or warning by SPC directly, through an appropriate intermediary or an subsequent psychiatric services provider to DeMeerleer, Ms. Schiering and her family most likely would have had the opportunity to have: taken reasonable effort to avoid contact with DeMeerleer; seek protection from him; and/or make themselves unavailable to access by DeMeerleer. Failure by SPC to follow-up and treat DeMeerleer appropriately precluded any such opportunity.

11. Considering my review of the referenced materials, and the forgoing, SPC breached the applicable standard of care by failing to exercise the degree of care, skill and learning expected of a reasonably prudent healthcare provider of psychiatric medical services, in the State of Washington, acting in the same or similar circumstances, with respect to the delivery of such psychiatric medical services to DeMeerleer, in various degrees, and at various times during the course of clinical treatment of DeMeerleer (collectively "Breaches"). These Breaches include, but are not

22

limited to: failing to perform adequate assessments of DeMeerleer's risk of harming himself, and others when clinically indicated to do so; and failing to adequately monitor DeMeerleer's psychiatric condition, and provide appropriate treatment.

12. But for the referenced Breaches by SPC, it is unlikely the Incident would have occurred.

13. The referenced Breaches were, collectively and individually, most likely a causal and substantial factor contributing to and in bringing about the Incident and the resulting harm of loss of life, and other physical and psychological injuries.

14. The referenced Breaches were, collectively and individually, a causal and substantial factor in contributing to and in bringing about loss of chance of a better outcome of the psychiatric care and treatment of DeMeerleer, and thus a loss of chance that the Incident and the resulting harm wouldn't have occurred.

CP at 89-91. Dr. Knoll does not opine that Spokane Psychiatric Clinic, P.S., independent of Dr. Howard Ashby, violated any standard of care held by a clinic.

The trial court granted Howard Ashby's and Spokane Psychiatric Clinic, P.S.'s summary judgment motion, concluding that they could not have reasonably identified Rebecca, Phillip, or Brian as Jan DeMeerleer's target because he communicated no "actual threats of harm" toward them. CP at 262.

## LAW AND ANALYSIS

### Mental Health Professional's Duty

The broad issue on appeal is what duty is owed by a mental health professional to protect a third party from the violent behavior of the professional's patient or client. A narrower issue is whether a mental health professional holds a duty to protect a third person, when an outpatient, who occasionally expresses homicidal ideas, does not

23

identify a target. RCW 71.05.120 provides immunity to the mental health professional in the context of an involuntary commitment of the patient, unless the patient identifies a target of violence or unless the professional is grossly negligent or acts in bad faith. A difficult question for us is whether the language of RCW 71.05.120(2) should be applied by analogy outside the context of an involuntary commitment. Stated differently, a difficult question is whether a mental health professional's duty of care, when treating a voluntary outpatient, is limited to warning someone identified by the patient as the target of an act of violence.

There is no general duty to protect others from the criminal acts of a third party. *Kim v. Budget Rent A Car Sys., Inc.*, 143 Wn.2d 190, 196, 15 P.3d 1283 (2001). An exception to this rule exists, however, if there is a special relationship between the defendant and the victim or the defendant and the criminal. *Petersen v. State*, 100 Wn.2d at 426. Such a duty is imposed only if there is a definite, established, and continuing relationship between the defendant and the third-party criminal actor. *Estate of Jones v. State*, 107 Wn. App. 510, 518, 15 P.3d 180 (2000).

The "special relationship" rule in Washington and other states arises from *Restatement (Second) of Torts* § 315 (1965). This section reads:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

24

(b)    a special relation exists between the actor and the other which gives to the other a right to protection.

Jan DeMeerleer did not see Dr. Howard Ashby on a regular basis, but rather a hit-and-miss basis. We could question whether Ashby and DeMeerleer had a "definite, established, and continuing relationship." But, we accept that there is a question of fact as to whether this relationship existed. Dr. Ashby impliedly argues that the infrequent visits lessens his obligations, but he does not argue a special relationship is absent.

The leading case in Washington concerning the duty of a mental health professional is *Petersen v. State*, 100 Wn.2d 421. Plaintiff Cynthia Petersen was injured in an automobile accident in Tacoma. Petersen's car was struck by a vehicle driven by Larry Knox. Knox ran a red light while traveling approximately 50 to 60 miles per hour. Knox was under the influence of drugs. Two years earlier, Knox was released on parole for a burglary conviction on the condition he not use illicit drugs. A month before the accident, Knox was involuntarily committed to Western State Hospital after he removed one of his testicles while high on phencyclidine (PCP). Dr. Alva Miller, of Western State Hospital, released Knox early from the commitment because, in Dr. Miller's opinion, Knox had recovered from the drug reaction, was in full contact with reality, and was back to his usual type of personality and behavior. Five days later the car collision occurred.

Cynthia Petersen brought suit against the State of Washington, who operated Western State Hospital, alleging it negligently treated Knox by failing to protect her from

25

his dangerous propensities. Petersen argued that the failure of Dr. Miller, an employee of the State, to seek either additional confinement or to disclose information about Knox's parole violation was the proximate cause of her injuries. The jury agreed and rendered a verdict in her favor. The jury even ruled that Dr. Miller was grossly negligent. Petersen needed to prove gross negligence because she lacked any expert testimony to show that Miller violated a standard of care. Expert testimony is not needed in a medical negligence action when the plaintiff proves a gross deviation from the standard. *Petersen*, 100 Wn.2d at 437.

On appeal, the State of Washington, in *Petersen v. State*, argued it held no duty to protect Cynthia Petersen from Larry Knox. The high court disagreed. The court ruled that Dr. Miller, the State's employee, incurred a duty to take reasonable precautions to protect anyone who might foreseeably be endangered by Larry Knox's drug-related mental problems. At trial, Dr. Miller testified that Knox was a potentially dangerous person and that his behavior would be unpredictable. He also testified that if Knox used angel dust again he was likely to continue having delusions and hallucinations, especially if he quit taking a prescribed drug. Dr. Miller testified he knew of Knox's reluctance to take the drug, and he thought it quite likely Knox would revert to using angel dust again. Nevertheless, Dr. Miller failed to petition the court for a 90-day commitment, as he could have done under RCW 71.05.280, or to take other reasonable precautions to protect those who might foreseeably be endangered by Knox's drug-related mental problems.

26

*Petersen v. State* relied in part on *Kaiser v. Suburban Transp. Sys.*, 65 Wn.2d 461, 398 P.2d 14, 401 P.2d 350 (1965), wherein our state high court allowed a third party to sue a doctor for injuries caused by the doctor's patient. The doctor failed to warn his patient, who he knew was a bus driver, of the side effects of a drug he prescribed. The plaintiff, a bus passenger, was injured when the driver lost consciousness and struck a telephone pole. The court held that, since the doctor knew of the drug's side effects and that his patient was a bus driver, he could reasonably have foreseen the harm. *Kaiser*, 65 Wn.2d at 464. Accordingly, the bus passenger was entitled to present evidence that the doctor's negligence was the proximate cause of her injuries.

All specialties of medicine are both art and science, but psychiatry may be more art than science. The physician in *Kaiser v. Suburban Transportation System*, likely easily diagnosed the nasal condition, readily prescribed the one drug, and should have without much thought warned his patient of the side effect of the drug. Psychiatry is not as routine. Diagnosing whether a patient is a danger to others, particularly when the patient has no history of violence, is problematic. Applying the *Kaiser* rule to a mental health professional is a stretch.

Jan DeMeerleer suffered from bipolar disorder. He had expressed to Dr. Howard Ashby and others both suicidal and homicidal ideas. He attempted suicide once. He never attempted homicide and had a sparse history of violence toward others. The only history of violence is a punch in the mouth to Rebecca Schiering's nine-year-old autistic

27

son. DeMeerleer admitted homicidal thoughts about his ex-wife Amy and her boyfriend. He never expressed to Dr. Ashby or anyone else any homicidal ideation toward his girl friend, Rebecca Schiering, or her family.

The Schierings claim that, if Dr. Ashby had examined Jan DeMeerleer in compliance with the standard of care, the psychiatrist would have unearthed a homicidal desire toward Rebecca Schiering and thereby would have been able to warn her or others of the oncoming murders. If Howard Ashby treated DeMeerleer in compliance with the standard of care, it would have prevented the murders. The Schierings' expert, Dr. James Knoll supports these claims. Despite any personal views to the contrary, we must assume the veracity of Knoll's testimony. An appellate court does not weigh credibility in deciding a motion for summary judgment. *Jones v. Dep't of Health*, 170 Wn.2d 338, 354, 242 P.3d 825 (2010).

*Petersen* relied on the seminal case regarding the duty of a psychiatrist to protect against the conduct of a patient, *Tarasoff v. Regents of Univ. of Cal.*, 17 Cal. 3d 425, 551 P.2d 334, 131 Cal. Rptr. 14 (1976). In *Tarasoff*, the parents of Tatiana Tarasoff alleged the defendant therapists had a duty to warn their daughter of the danger posed to her by one of the therapists' patients. The patient killed Tatiana. Two months prior to the killing, the patient informed his therapist that he intended to kill a young woman. Although the patient did not name Tatiana as his intended victim, the parents alleged, and

28

the trial court agreed, that the therapists could have readily identified the endangered person as Tatiana.

The *Tarasoff* court ruled that when a psychotherapist determines, or, pursuant to the standards of the profession, should determine, that a patient presents a serious danger of violence to another, the therapist incurs an obligation to use reasonable care to protect the intended victim against such danger. *Tarasoff*, 17 Cal. 3d at 435. According to the *Tarasoff* court, discharge of the duty may require the therapist to take whatever steps are necessary under the circumstances, including possibly warning the intended victim or notifying law enforcement officials. *Tarasoff*, 17 Cal. 3d at 445.

*Tarasoff* could be read to limit the duty of the mental health professional to protect others to circumstances where the patient identifies his intended victim or provides enough information about the victim so that the psychiatrist can identify him or her. Nevertheless, the *Tarasoff* decision did not emphasize the identifiability of the victim. Subsequent California decisions limited the scope of the therapist's duty to readily identifiable victims. *See Thompson v. County of Alameda*, 27 Cal. 3d 741, 752-54, 614 P.2d 728, 167 Cal. Rptr. 70 (1980); *Mavroudis v. Superior Court*, 102 Cal. App. 3d 594, 600-01, 162 Cal. Rptr. 724 (1980).

Under *Tarasoff* and its offspring, Dr. Howard Ashby would be granted summary judgment. Jan DeMeerleer never identified Rebecca Schiering or her family members as

29

a target of violence. The Schierings do not directly argue that the punch to Jack should have alerted Spokane Psychiatric Clinic, P.S. to a homicidal danger toward the family.

The final decision that the *Petersen* court relied on is *Lipari v. Sears, Roebuck & Co.*, 497 F. Supp. 185 (D. Neb. 1980). In *Lipari*, the court emphasized the importance of foreseeability in defining the scope of a person's duty to exercise due care. In that case, a psychiatric patient entered a night club and fired a shotgun into a crowded dining room causing injuries to plaintiff and killing her husband. The *Lipari* court found that the defendant's therapist had a duty to any person foreseeably endangered by the negligent treatment of the psychiatric patient.

*Petersen* presents the extreme version of the duty imposed on a mental health professional to protect others. The decision is criticized by commentators and rejected by most other states, including California. Commentators protest that the decision places an impossible burden on mental health professionals and unduly interferes in the physician-patient privilege. Patients will withhold thoughts of violence for fear the professional will disclose those thoughts to others. The bond of trust between patient and doctor will dissolve. According to critics of *Petersen*, mental health professionals will be quick to seek involuntary commitment of a patient in order to avoid liability, thereby impinging on the freedom and civil rights of the mentally ill.

*Petersen* promotes the view that those with special powers, skills, and knowledge gained through the doctor-patient relationship must protect society at large from dangerous persons.

> With their superior knowledge, psychiatrists are expected to identify individuals who are dangerous to themselves or others and to recommend preventive action. This occurs both in the mental health context and within the judicial system where psychiatrists are called upon to assist in making decisions about culpability, competence, incarceration, or rehabilitation.

Fay Anne Freedman, *The Psychiatrist's Dilemma: Protect the Public or Safeguard Individual Liberty?*, 11 U. PUGET SOUND L. REV. 255, 260 (1987-1988) (footnotes omitted). In Washington, we expect psychiatrists to predict whether a sexually violent offender will relapse after treatment. RCW 71.09.055; *In re Det. of Campbell*, 139 Wn.2d 341, 357-58, 986 P.2d 771 (1999); *In re Pers. Restraint of Young*, 122 Wn.2d 1, 56-58, 857 P.2d 989 (1993); *In re Det. of Aguilar*, 77 Wn. App. 596, 601-02, 892 P.2d 1091 (1995). Still, empirical evidence establishes that psychiatry is an ill predictor of violent behavior. Michael A. Norko and Madelon V. Baranoski, *The Prediction of Violence; Detection of Dangerousness*, 8 BRIEF TREATMENT & CRISIS INTERVENTION 73, 77-78 (2008); Mairead Dolan & Michael Doyle, *Violence Risk Prediction: Clinical and Actuarial Measures and the Role of the Psychopathy Checklist*, 177 THE BRIT. J. PSYCHIATRY 303 (2000).

*Petersen v. State*'s duty of care only extends to those "foreseeably endangered" by the patients' mental problems. Nevertheless, Washington decisions place no limitations

31

as to who is foreseeably endangered. The jury's function is to decide the foreseeability of the danger. *Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 933, 653 P.2d 280 (1982). Ordinarily, foreseeability is a question of fact for the jury unless the circumstances of the injury "'are so highly extraordinary or improbable as to be wholly beyond the range of expectability.'" *Seeberger v. Burlington N.R.R.*, 138 Wn.2d 815, 823, 982 P.2d 1149 (1999) (quoting *McLeod v. Grant County Sch. Dist. No. 128*, 42 Wn.2d 316, 323, 255 P.2d 360 (1953)); *see also Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 478, 951 P.2d 749 (1998).

In *Bader v. State*, 43 Wn. App. 223, 716 P.2d 925 (1986), this division followed the teachings of *Petersen v. State*, 100 Wn.2d 421. Morris Roseberry was arrested for assaulting his mother with a board. He was sent to Eastern State Hospital (ESH) for observation to determine whether he was competent to stand trial. The staff diagnosed him as a paranoid schizophrenic and manic depressive, stating, "Mr. Roseberry is a substantial danger to other persons and presents a likelihood of committing felonious acts jeopardizing public safety or security unless kept under further control by the court or other persons or institutions." *Bader*, 43 Wn. App. at 224. ESH concluded he was competent to stand trial, however. A jury acquitted Roseberry on the ground of insanity and the court released him conditioned upon his taking his prescribed medication, receiving treatment at the Chelan-Douglas Mental Health Center, and not returning to the family home.

32

Morris Roseberry's sister later informed the mental health center that he was not taking his medication and was talking of seeing the devil in people and how he must kill the devil. His family members felt threatened by his behavior. Roseberry missed several appointments at the center. Eventually, Roseberry showed for an appointment without evidencing any impairment.

Morris Roseberry lived across the street from Hazel Massey. Massey made several complaints to the Wenatchee Police Department about Roseberry's violent behavior toward her, including threats on her life. Four days after his last visit to the mental health clinic, Roseberry purchased a rifle, then shot and killed Massey. He was charged with first degree murder, but found not guilty by reason of insanity and committed to ESH.

In *Bader*, we reversed a summary judgment dismissal in favor of the Chelan-Douglas Mental Health Center. The center's records contained a copy of the court's order of acquittal on the ground of insanity and conditional release. The order stated Roseberry was a substantial danger to others and likely to commit felonious acts jeopardizing public safety. It also listed the conditions of his release, which included taking his medication, contacting the center and following its staff's instructions regarding treatment. The center's records showed it was aware Roseberry missed several of his appointments, was not taking his medication, and was talking of seeing the devil in people and how he must kill the devil. Thus, questions of fact existed as to the

foreseeability of Roseberry doing what he did and what action the center should have taken once it became aware Roseberry was violating the conditions of his court-ordered release. Massey's estate presented an affidavit of an expert, who opined that the center did not act within the standard of care and their actions were grossly negligent and in bad faith.

The Washington Legislature has narrowed the duty created by *Petersen v. State*. In 1987, the legislature enacted a new involuntary treatment act that provides limited immunity to mental health professionals in the context of the involuntary commitment process. This immunity already applied to public and law enforcement officers under a version of the law adopted in 1973. *See Spencer v. King County*, 39 Wn. App. 201, 692 P.2d 874 (1984), *overruled on other grounds*, *Frost v. City of Walla Walla*, 106 Wn.2d 669, 724 P.2d 1017 (1986).

The involuntary treatment act allows commitment of people who are either "gravely disabled" or present a "likelihood of serious harm." RCW 71.05.150. The involuntary commitment process is initiated when a mental health professional receives information alleging that a person presents an imminent likelihood of serious danger to himself or others, or is in imminent danger because of being gravely disabled. RCW 71.05.150. The mental health professional must thoroughly evaluate information received and assess the reliability and credibility of the person providing the information.

The initial detention of an individual may not exceed a 72-hour evaluation period. RCW 71.05.150(2)(a).

For our purposes, the relevant portion of the involuntary treatment act, RCW 71.05.120 reads:

> (1) No officer of a public or private agency, nor the superintendent, professional person in charge, his or her professional designee, or attending staff of any such agency, nor any public official performing functions necessary to the administration of this chapter, nor peace officer responsible for detaining a person pursuant to this chapter, nor any county designated mental health professional, nor the state, a unit of local government, or an evaluation and treatment facility shall be civilly or criminally liable for performing duties pursuant to this chapter with regard to the decision of whether to admit, discharge, release, administer antipsychotic medications, or detain a person for evaluation and treatment: PROVIDED, That such duties were performed in good faith and without gross negligence.
> (2) This section does not relieve a person from giving the required notices under RCW 71.05.330(2) or 71.05.340(1)(b), or the duty to warn or to take reasonable precautions to provide protection from violent *behavior where the patient has communicated an actual threat of physical violence against a reasonably identifiable victim or victims.* The duty to warn or to take reasonable precautions to provide protection from violent behavior is discharged if reasonable efforts are made to communicate the threat to the victim or victims and to law enforcement personnel.

(Emphasis added.) The immunity granted by RCW 71.05.120 extends only to third parties and not to the patient. *Spencer*, 39 Wn. App. 201.

We read the two sections of RCW 71.05.120 together to grant immunity to mental health professionals except with five exceptions: (1) the professional performs duties in bad faith; (2) the professional performs duties with gross negligence; (3) the professional

releases a patient before the expiration of an involuntary commitment without notifying the county prosecuting attorney at least thirty days before release pursuant to RCW 71.05.330(2); (4) the professional conditionally releases, for purposes of outpatient treatment, the patient before the expiration of an involuntary commitment without notifying the county prosecuting attorney at least 30 days before release under RCW 71.05.340(b); and (5) the professional fails to warn or take reasonable precautions to provide protection from violent behavior when the patient has communicated an actual threat of physical violence against a reasonably identifiable victim or victims.

We must decide whether we apply the duty enunciated in *Petersen v. State* or the duty implied by the withholding of immunity under RCW 71.05.120(2). Stated differently, we must decide if a mental health professional has a duty to protect all foreseeable victims or a duty to protect only victims identified by the outpatient.

RCW 71.05.120 by its terms applies only to the performance of "functions necessary to the administration of" chapter 71.05 RCW. The chapter concerns involuntary commitment to a mental health facility. Courts refer to the chapter as the involuntary treatment act. *Poletti v. Overlake Hosp. Med. Ctr.*, 175 Wn. App. 828, 831, 303 P.3d 1079 (2013). The involuntary treatment act is primarily concerned with the procedures for involuntary mental health treatment of individuals who are at risk of harming themselves or others, or who are gravely disabled. *Poletti*, 175 Wn. App. at 832.

36

The allegations of the Schierings can be read to assert a claim that Spokane Psychiatric Clinic, P.S. was negligent for failing to take steps to involuntarily commit Jan DeMeerleer. Such a claim is ripe for summary judgment and we affirm the trial court to the extent it dismissed this claim.

Dr. James Knoll contends a thorough evaluation and treatment of Jan DeMeerleer may have led to a conclusion that DeMeerleer should receive "institutional treatment." We assume institutional treatment entails involuntary commitment. When the plaintiff claims the mental health professional should have detained the patient, the plaintiff is claiming the professional should have involuntarily committed the patient. *Estate of Davis v. Dep't of Corr.*, 127 Wn. App. 833, 840-41, 113 P.3d 487 (2005). Under such circumstances, RCW 71.05.120 controls and the mental health professional is entitled to immunity under the statute. *Poletti*, 175 Wn. App. at 831; *Estate of Davis*, 127 Wn. App. at 840-41. In *Poletti*, the trial court ruled that plaintiff need only satisfy a negligence standard when presenting evidence that a mental health hospital should have detained a patient. The Court of Appeals reversed, ruling that RCW 71.05.120's immunity applied. The only authority under that the hospital could have detained the patient was under the involuntary treatment act.

Subsection 2 of RCW 71.05.120 imposes an obligation on a mental health professional. It does not provide immunity, but withholds the immunity afforded in subsection 1 in a narrow circumstance. RCW 71.05.120(2) identifies an instance in

37

which the mental health professional can be found liable—when the patient threatens an identifiable person. It imposes a duty, rather than limiting a duty. But remember the statute applies only within the context of the involuntary commitment process. Subsection 2 does not preclude a broader duty outside the context of involuntary commitment. Should we read the standard as applying outside the involuntary commitment setting? Would the standard make as much sense outside the involuntary commitment background?

One commentator concludes the immunity afforded by RCW 71.05.120 will not be applied outside the context of involuntary commitment. Nevertheless, the commentator does not distinguish between portions or subsections of the statute. 16 DAVID DEWOLF AND KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE 707-08 (4 ed. 2013) discusses RCW 71.05.120 as follows:

> Similarly, a Washington statute grants limited immunity to mental health professionals and their employers who are responsible for decisions regarding the detention of a mental health patient, so long as they act in good faith and without gross negligence. The limited immunity applies not only to decisions regarding an actual detention, but also to the determination of whether to detain a patient involuntarily. Thus, where a patient voluntarily presented herself for treatment at a hospital, and was later admitted to the psychiatric ward, the statutory standard applied to a claim that the hospital negligently failed to refer the patient for a mental health evaluation. On the other hand, the ordinary negligence standard would apply to claims for negligent treatment that are not based on a decision regarding involuntary detention, such as the evaluation of the patient prior to the time that such a decision is made.

(Footnotes omitted.)

For the purpose of demarcating to whom a duty is owed we discern no reason to differentiate between treating a mental health patient in the context of involuntary commitment and treating a patient outside that context. Under either circumstance, predicting violent behavior and the target of the violent behavior is difficult. Nevertheless, we also discern no purpose in differentiating between applying a negligence or gross negligence standard in these two contexts. But RCW 71.05.120 distinguishes between the two contexts.

In short, the state legislature saw a need to protect mental health professionals within the context of involuntary commitment proceedings. The legislature has not extended those same protections outside that context. So we conclude that the *Petersen* duty applies in our case. There is a question of fact as to whether the clinic violated a duty owed to Rebecca Schiering and her family, except to the extent the Schierings argue that Howard Ashby should have involuntarily institutionalized Jan DeMeerleer.

We now address specific contentions raised by Dr. Ashby and Spokane Psychiatric Clinic, P.S. Howard Ashby focuses on former Justice Phillip Talmadge's concurring opinion in *Hertog v. City of Seattle*, 138 Wn.2d 265, 293 n.7, 979 P.2d 400 (1999) (Talmadge, J., concurring), in which he writes, "the Legislature statutorily abrogated our holding in *Petersen* in LAWS OF 1987, ch. 212, § 301(1) (codified at RCW 71.05.120(1)), with respect to liability of the State." We do not consider a concurring opinion controlling. Also, this appeal does not concern the liability of the State of Washington.

39

*Hertog* involved the duty owed by a parole officer, not the duty imposed on a mental health professional with regard to an outpatient.

Dr. Howard Ashby contends that RCW 70.02.050 precluded him from warning Rebecca Schiering of any violent tendency of Jan DeMeerleer, since DeMeerleer never identified Schiering as a potential target of violence. Ashby contends the statute limits any warning to a third party who is a named target of violence. We do not read the statute that narrowly. The statute allows disclosure of health care information:

> (d) To any person if the health care provider or health care facility reasonably believes that disclosure will avoid or minimize an imminent danger to the health or safety of the patient or any other individual, however there is no obligation under this chapter on the part of the provider or facility to so disclose.

RCW 70.02.050(d). The statute also does not expressly preclude disclosure in circumstances where there is no identified victim.

Howard Ashby emphasizes that RCW 70.02.050, enacted in 1991, did not exist when our Supreme Court decided *Petersen v. State*. Nonetheless, the patient-physician privilege existed under another statute at the time of the 1983 *Petersen* decision. RCW 5.60.060(4), that recognizes the privilege, is based on legislation adopted in pre-territorial days. *Petersen* recognized a psychologist-client privilege, RCW 18.83.110, and a privilege in involuntary commitment proceedings, RCW 71.05.390, but ruled that neither privilege overcame the duty to protect third parties.

40

Dr. Howard Ashby wishes us to hold that he lacked notice that Jan DeMeerleer was an "imminent danger to the health and safety" of others, and, therefore, based on RCW 70.02.050(d), he garnered no duty to protect others. Since we conclude that the statute does not limit the psychiatrist's tort duty, we need not address this argument. Anyway, the Schierings argue and their expert testifies that, if Howard Ashby had met the standard of care and engaged in intensive treatment, Jan DeMeerleer would have disclosed information leading a mental health professional to reasonably believe DeMeerleer was an imminent danger to others.

Howard Ashby contends that the duty to warn third parties arises only if the mental health professional "takes control" of the patient. Washington decisional law does not limit the duty to such circumstances. *Petersen* involved release from involuntary commitment, but did not limit its holding to such circumstances or declare that the duty to protect others applied only when the mental health professional had authority to control the patient. In *Bader*, we reversed summary judgment in favor of the Chelan-Douglas Mental Health Center despite the center never having "control" over the patient. 43 Wn. App. at 227-28.

Amicus contends that three decisions limit the *Petersen* duty to instances of institutional confinement: *Taggart v. State*, 118 Wn.2d 195, 218, 822 P.2d 243 (1992); *Couch v. Dep't of Corr.*, 113 Wn. App. 556, 571, 54 P.3d 197 (2002); and *Osborn v. Mason County*, 157 Wn.2d 18, 24, 134 P.3d 197 (2006). *Taggart*, is two consolidated

cases that plaintiffs claimed the Indeterminate Sentence Review Board and individual parole officers were negligent for releasing and supervising parolees. *Taggart* affirmed *Petersen v. State*. The State sought to limit the *Petersen* duty to instances when the criminal actor is released from a mental hospital and argued that a parole officer lacks control over the parolee since the parolee is already in the community. The court declined to make such a distinction. The court declared, "Whether the patient is a hospital patient or an outpatient is not important." *Taggart*, 118 Wn.2d at 223. Thus, *Taggart* supports our ruling not amicus' argument.

In *Osborn v. Mason County*, parents sued because a registered sex offender raped and murdered their daughter. They claimed Mason County failed to warn them of the offender's presence. The Supreme Court held that Mason County had no duty to warn the Osborns because they did not rely on a promise to warn and the daughter was not a foreseeable victim. Although the court mentioned the county's lack of control over the offender, it did not limit the *Petersen* duty.

*Couch v. Department of Corrections*, addressed the question of whether the department owes a duty of care to prevent future crimes while supervising an offender only for the purpose of collecting money. The court answered no, but made no statement limiting the force of *Petersen*.

Lost Chance

The Schierings also allege that Dr. Howard Ashby's violation of the standard of care reduced Phillip and Rebecca Schiering's chance of survival. Thus, they assert a claim for lost chance, but Dr. Knoll provides no percentage for the lost chance. We dismiss any lost chance claim based on an allegation that Dr. Ashby should have involuntarily committed Jan DeMeerleer, on the basis of immunity under RCW 71.05.120. We further dismiss the lost chance claim in its entirety because the Schierings presented no expert testimony of percentage of lost chance. *Rash v. Providence Health & Serv.*, No. 31277-1-III (Wash. Ct. App. Sept. 16, 2014).

Every Washington decision that permits recovery for a lost chance contains testimony from an expert health care provider that includes an opinion as to the percentage or range of percentage reduction in the chance of survival. *Herskovits v. Grp. Health Coop of Puget Sound*, 99 Wn.2d 609, 611, 664 P.2d 474(1983) (14 percent reduction in chance of survival); *Mohr v. Grantham*, 172 Wn.2d 844, 849, 262 P.3d 490 (2011) (50 to 60 percent chance of loss of better outcome); *Shellenbarger v. Brigman*, 101 Wn. App. 339, 348, 3 P.3d 211 (2000) (20 percent chance that the disease's progress would have been slowed). Without that percentage, the court would not be able to determine the amount of damages to award the plaintiff, since the award is based on the percentage of loss. *See Smith v. Dep't of Health & Hosps.*, 95-0038 (La. 6/25/96); 676 So. 2d 543, 548. Discounting damages by that percentage responds to a concern of

awarding damages when the negligence was not the proximate cause or likely cause of the death. *Mohr*, 172 Wn.2d at 858; *Matsuyama v. Birnbaum*, 452 Mass. 1, 17, 890 N.E.2d 819 (2008). Otherwise the defendant would be held responsible for harm beyond that which it caused. The leading author on the subject of lost chance declares:

> Despite the sound conceptual underpinnings of the doctrine, its successful application depends on the quality of the appraisal of the decreased likelihood of a more favorable outcome by the defendant's tortious conduct.

Joseph H. King, Jr., *"Reduction of Likelihood" Reformulation and Other Retrofitting of the Loss-of-a-Chance Doctrine*, 28 U. MEM. L. REV. 491, 546-47 (1998). This quote promotes accurate calculations and use of percentages.

## James Knoll's Testimony

Dr. Howard Ashby contends that the Schierings offered a declaration from an expert witness containing generalities, factually unsupported conclusions and speculation, advocating for a boundless and expansive duty to warn. If we were the trier of fact, we might agree with Dr. Ashby, but our role is not to weigh the credibility of the witness or the validity of expert opinions. Courts do not weigh the evidence or assess witness credibility on a motion for summary judgment. *Am. Express Centurion Bank v. Stratman*, 172 Wn. App. 667, 677, 292 P.3d 128 (2012). Dr. James Knoll is a qualified mental health professional and Ashby does not challenge Knoll's credentials.

Dr. Ashby questions Dr. James Knoll's qualifications to opine about the standard of care imposed on a mental health professional in Washington State. Ashby's questioning fails to recognize that Washington allows a medical professional from another state to testify to the standard of care in Washington. In a medical malpractice suit, a plaintiff must prove the relevant standard of care through the presentation of expert testimony, unless a limited exception applies. *Harris v. Robert C. Groth, M.D., Inc. PS*, 99 Wn.2d 438, 449, 663 P.2d 113 (1983); *Douglas v. Bussabarger*, 73 Wn.2d 476, 479, 438 P.2d 829 (1968); and *Grove v. PeaceHealth St. Joseph Hosp.*, 177 Wn. App. 370, 382, 312 P.3d 66 (2013), *review granted*, 180 Wn.2d 1008, 325 P.3d 913 (2014). The standard of care is the degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he belongs, in the state of Washington. *Hill v. Sacred Heart Med. Ctr.*, 143 Wn. App. 438, 446, 177 P.3d 1152 (2008). A physician licensed in another state may provide admissible testimony that a national standard of care exists and that the defendant physician violated that standard. *Elber v. Larson*, 142 Wn. App. 243, 248, 173 P.3d 990 (2007); *Pon Kwock Eng v. Klein*, 127 Wn. App. 171, 110 P.3d 844 (2005).

Dr. Ashby's criticism also fails to note that Dr. Knoll contacted a Washington mental health professional to consult on the standard of care. One expert may rely on the opinions of another expert when formulating opinions. *State v. Russell*, 125 Wn.2d 24, 74-75, 882 P.2d 747 (1994); *Deep Water Brewing, LLC v. Fairway Res. Ltd.*, 152 Wn.

App. 229, 275, 215 P.3d 990 (2009). Dr. Ashby criticizes Dr. Knoll for failing to identify the Washington State practitioner, but we know of no rule that requires one expert witness to voluntarily identify another expert that he relies in forming opinions. Dr. Ashby could have conducted a deposition of Dr. Knoll to discover the name.

Howard Ashby does not identify the "factually unsupported conclusions" he believes are contained in Dr. Knoll's declaration. Dr. Knoll testifies to the facts, that he based his opinions, and states that he discovered those facts by reviewing Dr. Ashby's records. Dr. Ashby does not isolate any facts declared by Knoll missing from the records.

Summary judgment jurisprudence directs a court to reject "speculation" when reviewing summary judgment motions. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986); *State v. Kaiser*, 161 Wn. App. 705, 718, 254 P.3d 850 (2011). But the law likely recognizes two levels of speculation, one for purposes of summary judgment, and one for purposes of finding facts after an evidentiary hearing or trial. We do not consider Dr. Knoll's testimony speculative for purposes of defending a summary judgment motion. Dr. Knoll relied on facts found in the chart notes of Dr. Ashby. He gives a reasoned explanation for his conclusions. He bases his opinions on reasonable probability.

Imposing a duty on Dr. Ashby, in the setting of our case, entails addressing whether the Schiering family was a foreseeable victim. The family was more foreseeable

as a victim than Cynthia Petersen in *Petersen v. State*, since Larry Knox, the criminal actor in *Petersen*, had no prior connection to Cynthia Petersen. Jan DeMeerleer had a prior connection to Rebecca Schiering and her three sons. DeMeerleer had already slugged one son. According to the evidence before the court on summary judgment, Dr. Ashby knew that Jan DeMeerleer had already threatened to use violence against his former wife and her boyfriend. Dr. Ashby knew DeMeerleer suffered from distress and depression resulting from the breakup with Rebecca Schiering.

*Petersen v. State* also answers the dissent's position that no liability should attach to Dr. Ashby because there were no threats uttered about the Schierings. Cynthia Petersen was not the subject of prior threats.

Howard Ashby criticizes the declaration of Dr. James Knoll as suggesting that, had Dr. Ashby not violated the standard of care, "it is *possible* that Mr. DeMeerleer *may have* disclosed to Dr. Ashby homicidal thoughts Mr. DeMeerleer *may have* had about Ms. Schiering and/or her children." Br. of Resp't Dr. Howard Ashby at 5. After criticizing Knoll's affidavit, Ashby denounces the testimony as speculation on speculation. Dr. Knoll's opinions are stronger, however, than characterized. James Knoll testified that Spokane Psychiatric Clinic, P.S. should have properly monitored DeMeerleer, performed a risk assessment, and provided intensive clinical or institutional psychiatric treatment. Had Spokane Psychiatric Clinic, P.S.'s conduct conformed to the standard of care, the risk and occurrence of the incident "would have been mitigated," and "probably would

not have occurred," as DeMeerleer's mental distress probably would not have digressed to the level of allowing for an act of suicide or homicide. CP at 90. Knoll further declared that but for the breaches in the standard of care, "it is unlikely the Incident [sic] would have occurred." CP at 91. Dr. Knoll's declaration language meets the requirement that the subject of an expert's affidavit or declaration must be of such a nature that an expert expresses an opinion based on a reasonable probability rather than mere conjecture of speculation. *Davidson v. Mun. of Metro. Seattle*, 43 Wn. App. 569, 571, 719 P.2d 569 (1986).

Dr. Ashby further faults the declaration of James Knoll as being speculative because Knoll testifies that additional treatment "may" have led to Jan DeMeerleer disclosing homicidal thoughts about Rebecca Schiering or her children. Ashby correctly notes that this testimony assumes that Jan DeMeerleer entertained homicidal thoughts about Schiering or her boys before the evening of July 18, 2010. But James Knoll's testimony is not limited to an opinion that more extensive treatment would have allowed Ashby to warn Rebecca Schiering of violent behavior. Dr. Knoll also testifies that extensive treatment would itself have been "demonstrably effective." CP at 88. With intensive treatment, Jan DeMeerleer's "mental distress probably would not have digressed to the level of allowing for an act of suicide and/or homicide." CP at 89.

Howard Ashby criticizes James Knoll for failing to attach to his declaration those clinical records that he reviewed. We are not aware of any rule requiring that the expert

48

witness attach to a declaration records on which he relies. To the contrary, ER 705 allows an expert to even testify to his opinions without disclosing the underlying basis until asked or ordered by the court.

Liability of Spokane Psychiatric Clinic, P.S.

The parties provide no evidence of the relationship between Spokane Psychiatric Clinic, P.S. and Howard Ashby. We do not know if Ashby is an employee of the clinic, such that the clinic is vicariously liable for the conduct of Howard Ashby. We do not know if Ashby was an independent contractor. In response to Spokane Psychiatric Clinic, P.S.'s summary judgment motion, the Schierings provided no evidence or opinion that Spokane Psychiatric Clinic, P.S. violated a standard of care and was independently negligent. On appeal, the Schierings assign no error to the dismissal of Spokane Psychiatric Clinic, P.S. except to the extent of it's vicarious liability for the conduct of Howard Ashby.

In its brief, Spokane Psychiatric Clinic, P.S. admits that it is vicariously liable for any malpractice of Howard Ashby. In their reply brief, the Schierings admit they have no evidence of direct negligence by the clinic. Based on these concessions, we affirm the trial court's dismissal of the claims asserted by the Schiering family that the clinic failed to establish and implement policies and procedures to prevent the deaths and injuries to the family members. In other words, we affirm the dismissal of any claim against the clinic for independent negligence. Spokane Psychiatric Clinic, P.S. remains subject to

49

No. 31814-1-III
*Volk v. DeMeerleer*

liability to the extent that Howard Ashby is found negligent, and thus the summary judgment ruling in favor of the clinic is reversed to the extent of vicarious liability.

CONCLUSION

We reverse in part, and affirm in part, the summary judgment order in favor of Dr. Howard Ashby. To the extent that the Schierings contend Dr. Ashby should have involuntarily committed Jan DeMeerleer, the dismissal is affirmed. We also affirm the dismissal of the Schierings' claim of lost chance. Otherwise, the summary judgment order for Dr. Howard Ashby is reversed. We reverse in part, and affirm in part, the summary judgment order in favor of Spokane Psychiatric Clinic, P.S. To the extent that the Schierings contend the clinic is independently negligent, the summary judgment order is affirmed. The summary judgment order is reversed to the extent that Spokane Psychiatric Clinic, P.S. is vicariously liable.

We remand for further proceedings consistent with this opinion.

_____
Fearing, J.

I CONCUR:

_____
Lawrence-Berrey, J.

50

No. 31814-1-III

BROWN, A.C.J. (concurring in part/dissenting in part) — In my view, appellants fail to show Mr. DeMeerleer ever communicated to respondents any actual threat of physical harm concerning these third-party appellants during his treatment. Thus, under current applicable law, I would hold respondents fail to show the necessary foreseeable risk of harm to raise a legal duty to protect appellants. I would affirm the trial court's grant of summary judgment in all respects.[1]

Long before this tragic incident, Mr. DeMeerleer expressed isolated homicidal thoughts about an ex-wife and an unknown prowler. Mr. DeMeerleer never mentioned to respondents any homicidal or threatening thoughts toward appellants. Indeed, on April 16, 2010, Mr. DeMeerleer last saw respondents, telling them he was mending his relationship with Rebecca and would not act on his suicidal ideas. On July 18, 2010 when off his medications, Mr. DeMeerleer shot and killed Rebecca and Phillip, attempted to kill Brian, then killed himself. Family members, friends, and acquaintances who visited Mr. DeMeerleer shortly before the incident gleaned no indication of any plan. Respondents moved successfully for summary judgment, partly arguing they owed no third-party duty. The trial court agreed, reasoning respondents could not have

---

[1] For clarity, I use given names.

reasonably identified Rebecca, Phillip, or Brian as Mr. DeMeerleer's target because he communicated no "actual threat of physical violence" toward them. RCW 71.05.120(2).

To prevail in a professional malpractice suit against a mental health care provider, the plaintiff must prove the defendant breached a duty owed to him or her and, thereby, proximately caused damages. *Petersen v. State*, 100 Wn.2d 421, 435, 671 P.2d 230 (1983). At common law, a person owes no duty to control a dangerous person's conduct or protect a foreseeable victim from it unless the person has a special relationship with either the dangerous person or the foreseeable victim. In *Kaiser v. Suburban Transportation System*, 65 Wn.2d 461, 398 P.2d 14, 401 P.2d 350 (1965), our Supreme Court acknowledged a physician-patient relationship may trigger a duty for the benefit of an injured third party.

In 1973, our legislature immunized mental health professionals from civil and criminal liability for performing certain statutory duties "in good faith and without negligence." LAWS OF 1973, 1st Ex. Sess., ch. 142, § 17; LAWS OF 1973, 2d Ex. Sess., ch. 24, § 5. Our legislature increased this standard of care the next year, requiring performance "in good faith and without gross negligence." LAWS OF 1974, 1st Ex. Sess., ch. 145, § 7. Last amended in 2000, this immunity provision now reads,

> (1) No officer of a public or private agency, nor the superintendent, professional person in charge, his or her professional designee, or attending staff of any such agency, nor any public official performing functions necessary to the administration of this chapter, nor peace officer responsible for detaining a person pursuant to this chapter, nor any county designated mental health professional, nor the state, a unit of local government, or an evaluation and treatment facility shall be civilly or criminally liable for performing duties pursuant to this chapter with regard to the decision of whether to admit, discharge, release, administer

2

antipsychotic medications, or detain a person for evaluation and treatment: PROVIDED, That such duties were performed in good faith and without gross negligence.

RCW 71.05.120(1).[2]

Historically, the California Supreme Court decided the landmark case of *Tarasoff v. Regents of the University of California*, 17 Cal. 3d 425, 551 P.2d 334, 131 Cal. Rptr. 14 (1976). There, a voluntary outpatient told his psychotherapist he planned to kill an unnamed but readily identifiable woman when she returned home from summer travels. *Id.* at 432. The therapist disclosed the plan to law enforcement, who arrested the patient but released him. *Id.* The therapist did not warn the targeted woman or her family. *Id.* at 433. The patient soon killed the targeted woman as planned. *Id.* Applying *Restatement (Second) of Torts* § 315 (1965), the *Tarasoff* court held the therapist-patient relationship triggered a duty for the benefit of the victim and her family. *Id.* at 435-36. Thus, the therapist owed the victim and her family a duty to warn them of the threat the patient posed. *Id.* at 435-36, 438. The *Tarasoff* court ruled:

> When a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, depending upon the nature of the case. Thus it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances.

*Id.* at 431.

---

[2] In their opening brief to us, appellants argue RCW 71.05.120(1) applies solely to mental health professionals at public agencies. But in their reply brief to us, appellants properly concede that argument is untenable.

Later California cases decided a psychotherapist owes a duty solely to a person he or she can readily identify as the patient's target. *See Thompson v. County of Alameda*, 27 Cal. 3d 741, 752-54, 614 P.2d 728, 167 Cal. Rptr. 70 (1980); *Mavroudis v. Superior Court*, 102 Cal. App. 3d 594, 600, 162 Cal. Rptr. 724 (1980); 4 STEWART M. SPEISER, CHARLES F. KRAUSE & ALFRED W. GANS, THE AMERICAN LAW OF TORTS § 15:41, at 772-73 (2009). Cases from other jurisdictions similarly hold a psychotherapist owes a duty to any person he or she should reasonably foresee is endangered by the patient's mental condition. *See Semler v. Psychiatric Inst.*, 538 F.2d 121, 124 (4th Cir. 1976); *Lipari v. Sears, Roebuck & Co.*, 497 F. Supp. 185, 194-95 (D. Neb. 1980); *Williams v. United States*, 450 F. Supp. 1040, 1046 (D.S.D. 1978); SPEISER, KRAUSE & GANS, *supra*, § 15:41, at 773-74.

The *Petersen* court adopted the latter approach. *Petersen*, 100 Wn.2d at 427-28. Applying *Tarasoff, Lipari*, and *Kaiser*, the *Peterson* court held the therapist involved owed a duty to any person he should have reasonably foreseen was endangered by the patient's drug-related mental problems. *Id.* at 428. The therapist owed the victim a duty to take reasonable precautions protecting her from the threat the patient posed. *Id.*

In 1985, the California Legislature enacted a measure "to limit the liability of psychotherapists under [*Tarasoff*]." *Barry v. Turek*, 218 Cal. App. 3d 1241, 1244, 267 Cal. Rptr. 553 (1990). Two years later, our legislature enacted a similar measure adding a subsection to the then-existing immunity provision that effectively limited the liability of mental health professionals under *Petersen, Tarasoff*, and *Lipari*. Under subsection (1), a mental health professional is immune from civil and criminal liability for

4

performing duties arising from chapter 71.05 RCW regarding a decision to "admit, discharge, release, administer antipsychotic medications, or detain a person for evaluation and treatment" so long as the professional performs the duties "in good faith and without gross negligence." Critical here is subsection (2):

> This section does not relieve a person from . . . the duty to warn or take reasonable precautions to provide protection from violent behavior where the patient has communicated an *actual threat of physical violence* against a *reasonably identifiable victim or victims*. The duty to warn or to take reasonable precautions to provide protection from violent behavior is discharged if reasonable efforts are made to communicate the threat to the victim or victims and to law enforcement personnel.

LAWS OF 1987, ch. 212, § 301(2) (emphasis added) (codified at RCW 71.05.120(2)).

Under subsection (2), a mental health professional still has a duty to "warn or to take reasonable precautions to provide protection from violent behavior" where a patient communicates to the professional an "actual threat of physical violence against a reasonably identifiable victim or victims." In my view, this record fails to show Mr. DeMeerleer communicated to respondents the necessary threat of physical violence toward appellants.

Considering the historical development of RCW 71.05.120, two principles emerge. First, a mental health professional owes the duties specified in subsection (1) to any person he or she should reasonably foresee is endangered by the patient's mental condition. *See* Fay Anne Freedman, *The Psychiatrist's Dilemma: Protect the Public or Safeguard Individual Liberty?*, 11 PUGET SOUND L. REV. 255, 276-77 (1988). Second, a mental health professional owes the duties specified in subsection (2) solely to a person he or she can reasonably identify as the patient's target after the patient

5

communicates an actual threat of physical violence. *See id.* Thus, RCW 71.05.120(1) and (2) address different duties that should be separately analyzed.

*Petersen* would be decided the same under subsection (1) because, while the victim was reasonably foreseeable, the psychotherapist was grossly negligent in performing duties arising from chapter 71.05 RCW regarding the decision to discharge the patient or petition for additional commitment. *See* 100 Wn.2d at 424, 428-29, 436-38; Freedman, *supra*, at 277. *Contra Hertog v. City of Seattle*, 138 Wn.2d 265, 292, 293 n.7, 979 P.2d 400 (1999) (Talmadge, J., concurring). But *Petersen* would be decided differently under subsection (2) because, while the psychotherapist was grossly negligent in failing to take reasonable precautions protecting against the threat the patient posed, the patient did not communicate an actual threat of physical violence; thus, the victim was not reasonably identifiable and foreseeable. *See* 100 Wn.2d at 424, 428-29, 436-38; Freedman, *supra*, at 277.

Here, the sole focus is RCW 71.05.120(2) because appellants alleged respondents did not adequately assess Mr. DeMeerleer's suicide risk or plan follow-up care. Appellants allege doing so would likely have resulted in better psychiatric care exposing Mr. DeMeerleer's homicidal thoughts about Rebecca, Phillip, and Brian that would, in turn, have prevented the incident by either mitigating Mr. DeMeerleer's dangerousness or serving as cause to warn and protect them. While these claims are broad enough to allege respondents breached the duties specified in either subsection (1) or (2), appellants reply brief clarified they did not intend to allege respondents breached any duties arising from chapter 71.05 RCW regarding a decision to "admit,

6

discharge, release, administer antipsychotic medications, or detain a person for evaluation and treatment." RCW 71.05.120(1).[3] Therefore, appellants solely alleged respondents breached the duty to "warn or to take reasonable precautions to provide protection from violent behavior." RCW 71.05.120(2).[4]

In sum, I would hold the trial court correctly reasoned that respondents could not have reasonably identified Rebecca, Phillip, or Brian as Mr. DeMeerleer's targets because he communicated no "actual threat of physical violence" toward them. RCW 71.05.120(2). Because I would affirm the trial court's summary judgment dismissal of appellants' third-party liability claims, I respectfully dissent to the majority decision to reverse the trial court's grant of summary judgment to respondents on the third-party claims. I concur with the majority decisions partly affirming the trial court's dismissal of the other claims.

---

[3] Even if the duties specified in RCW 71.05.120(1) applied, I would conclude appellants lack evidence showing respondents performed those duties in bad faith or with gross negligence.

[4] I would reject appellants' attempt to distinguish the duty specified in RCW 71.05.120(2) from the case law. Subsection (2) clearly addresses the same case law duty. *Compare* RCW 71.05.120(2) ("This section does not relieve a person from . . . the duty to warn or take reasonable precautions to provide protection from violent behavior . . . ."), *with Peterson*, 100 Wn.2d at 428 (holding the psychotherapist "incurred a duty to take reasonable precautions to protect"); *Tarasoff*, 17 Cal. 3d at 431 (stating the relevant duty requires the psychotherapist to "use reasonable care to protect" by, for example, "warn[ing]" or "tak[ing] whatever other steps are reasonably necessary under the circumstances"); *Lipari*, 497 F. Supp. at 193 (same). Therefore, subsection (2) logically applies in the same circumstances as case law.

7

Accordingly, I concur in part and dissent in part.

_____
Brown, A.C.J.

8