**FILED**
**JULY 12, 2016**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| SHERRIE LENNOX, as Personal Representative of the ESTATE OF VIOLA WILLIAMS, | ) ) ) ) | No. 33201-2-III |
| Appellants, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| LOURDES HEALTH NETWORK a Washington non-profit corporation; BENTON COUNTY and FRANKLIN COUNTY, Washington municipal corporations, | ) ) ) ) ) ) | |
| Respondents. | ) ) ) ) ) | |

FEARING, C.J. — Under RCW 71.05.120, an entity enjoys immunity from conduct related to the failure to involuntarily commit a mental health patient, but not for gross negligent acts. On the basis of this immunity, the trial court dismissed on summary judgment claims against Lourdes Health Network and Benton and Franklin Counties Crisis Response Unit for the murder of Viola Williams by her grandson, Adam Williams,

a mental health patient. We affirm the summary dismissal in favor of the Crisis Response Unit and reverse the dismissal in favor of Lourdes Health Network.

## FACTS

The background to Sherrie Lennox's lawsuit against Lourdes Health Network and the Crisis Response Unit concerns the mental illness of Adam Williams and treatment for the illness. From the age of eleven, Adam Williams struggled with attention deficit hyperactivity disorder, major depression, and substance abuse. He began using methamphetamine, marijuana, and alcohol at age twelve. He abused inhalants such as gasoline and glue, hallucinogenic mushrooms, lysergic acid diethylamide (LSD) and other drugs, and participated in substance abuse treatment several times. By the age of sixteen, Williams sat in juvenile detention sixteen times, with ten convictions for crimes such as malicious mischief, forgery, residential burglary, and eluding the police. At age seventeen, Williams began hearing voices and developed the delusion that he could read minds and communicate with God and others telepathically. Williams tried to kill himself three times, once by jumping into a river and twice by refusing food for extended periods of time while incarcerated.

On June 6, 2006, Adam Williams was found not guilty by reason of insanity of third degree assault and the court involuntarily committed him to Eastern State Hospital (Eastern). Due to ongoing mental health issues, he remained civilly committed at Eastern for the next five years, the maximum permissible time. Eastern staff diagnosed Williams

with, and treated him for, chronic paranoid schizophrenia, recurrent major depression, and polysubstance abuse.

On March 8, 2011, nine days before Adam Williams' scheduled release date of March 17, Eastern psychiatrist Dr. Imelda Borromeo and designated mental health professional (DMHP) Scott Burke petitioned the Spokane County Superior Court for a seventy-two-hour hold to evaluate Williams to determine whether his involuntary commitment should continue beyond his release date. A DMHP is a mental health professional designated by a county or other government entity to perform duties with regard to mental health patients under the Involuntary Treatment Act, chapter 71.05 RCW. RCW 71.05.012(11). In their petition, Borromeo and Burke alleged that Williams qualified as "gravely disabled." RCW 71.05.020(17).

In their March 8, 2011, petition, Dr. Imelda Borromeo and DMHP Scott Burke declared that Adam Williams still experienced delusions, auditory hallucinations, and baseline depressive disorder. Williams lacked insight into his substance abuse. When outside a structured environment, Williams' illness increased such that he heard commands to injure others. Borromeo and Burke believed that Williams would not voluntarily admit himself for inpatient psychiatric treatment if his condition worsened again after his release from Eastern.

On March 10, 2011, Eastern State Hospital staff, including Dr. Imelda Borromeo, evaluated Adam Williams for possible release from Eastern on a less restrictive

3

alternative status. A less restrictive alternative status consists of "outpatient treatment provided to an individual who meets criteria for commitment but is not residing in a facility providing inpatient treatment." *What is a Less Restrictive Alternative (LRA)?*, WASH. ST. DEP'T OF SOC. & HEALTH SERVS., https://www.dshs.wa.gov/faq/what-less-restrictive-alternative-lra [https://perma.cc/9SYW-EV77]. A court will order a less restrictive alternative release for a gravely disabled individual if the court determines that such alternative treatment is in that person's best interest. Former RCW 71.05.240(3) (2009). A less restrictive alternative release is similar to being on probation for a criminal offense insofar as the court orders specific conditions with which an individual must comply in order to remain in an outpatient setting. Former RCW 71.05.340(3)(a) (2009).

In her evaluation for the less restrictive alternative, Dr. Imelda Borromeo observed:

> Although Mr. Williams continues to present with ongoing positive and negative symptoms of schizophrenia, he also has been able to manage his symptoms quite well without any aggressive or violent behaviors within this five years of inpatient stay. He has continued to mumble to himself and stare at others while in conversation. However, these have not interfered with his ability to communicate effectively. . . . Due to the fact that he has been hospitalized for quite some time, the temptation to use illegal substances and alcohol is extremely high as soon as he steps out of this safe environment into the community. He will, therefore, require some form of monitoring while in the community to ensure his compliance with medications and LRA [less restrictive alternative] conditions, thus, this petition is for a 90-day with LRA the day after his maximum commitment expires. Mr. Williams has done quite well during his time at Eastern State

4

Hospital, has developed his WRAP [wellness recovery action plan] . . . which he tends to use when he is out in the community. Further monitoring while doing that would help ensure his full integration into the community. Therefore, I petition for a 14-day with LRA release when his NGRI [not guilty by reason of insanity] expires on 3/17/11.

Clerk's Papers (CP) at 214.

On March 11, 2011, the Spokane County Superior Court released Adam Williams from Eastern State Hospital on a ninety-day less restrictive alternative placement, administered by Lourdes Health Network in Pasco. As part of the release, the Spokane court ordered Williams to attend appointments with Lourdes or cancel in advance, refrain from threatening to harm himself or others, refrain from using alcohol or drugs, refrain from possessing firearms, attend Alcoholics Anonymous and Narcotics Anonymous meetings, and take medications as prescribed. At the time of his release in March 2011, Eastern administered a complex course of medications to Williams consisting of the anti-psychotics haloperidol, quetiapine, and clozapine, anti-depressants lithium, venlafaxine, and bupropion, and medications to manage the side effects of the other medications.

Lourdes Health Network features a "program of assertive community treatment" (PACT) team, which is:

a person-centered recovery-oriented mental health service delivery model that has received substantial empirical support for facilitating community living, psychosocial rehabilitation, and recovery for persons who have the most severe and persistent mental illnesses, have severe symptoms and impairments, and have not benefited from traditional outpatient programs.

. . . .

5

> PACT services are individually tailored with each consumer and address the preferences and identified goals of each consumer. The approach with each consumer emphasizes relationship building and active involvement in assisting individuals with severe and persistent mental illness to make improvements in functioning, to better manage symptoms, to achieve individual goals, and to maintain optimism.
>
> The PACT team is mobile and delivers services in community locations to enable each consumer to find and live in their own residence and find and maintain work in community jobs rather than expecting the consumer to come to the program. Seventy-five percent or more of the services are provided outside of the program offices in locations that are comfortable and convenient for consumers.

CP at 227. All Lourdes PACT teams incorporate a team leader, a psychiatrist, registered nurses, a mental health professional, a chemical dependency specialist, and a vocational specialist.

As a provider of outpatient treatment, Lourdes Health Network retained statutory duties, the most relevant being:

> The hospital or facility designated to provide outpatient treatment shall notify the secretary or designated mental health professional when a conditionally released person fails to adhere to terms and conditions of his or her conditional release or experiences substantial deterioration in his or her condition and, as a result, presents an increased likelihood of serious harm.

Former RCW 71.05.340(3)(b) (2009). Benton and Franklin Counties jointly operate the Bi-County Crisis Response Unit, which employs the respective counties' DMHPs. Thus, Lourdes was obligated to report violations by Adam Williams, of his less restrictive alternative release order, to the Crisis Response Unit. Lourdes could not on its own revoke the least restrictive alternative placement. The Crisis Response Unit held this

6

prerogative under RCW 71.05.340.

Despite the terms of Adam Williams' less restrictive alternative release order, Lourdes Health Network viewed Williams' participation in its outpatient treatment program as voluntary. For example, Lourdes nurse Michelle Aronow testified in a deposition:

> Q. Okay, did you have the ability to ensure that he took his, or that he underwent regular urinalysis?
> A. I could write a standing order.
> Q. Did you ever write a standing order?
> A. No.
> Q. Why not?
> A. I could only answer that on the fact that this being a voluntary program and my ability to attempt to build rapport with a patient is very important because if you do not, in my experience, the patient says, I'm not being a part of this program and then he would be on the streets in no program and not have the intensity of the PACT team.

CP at 283. Dana Oatis also testified that Adam Williams joined "the PACT team on a voluntary basis." CP at 292.

During its supervision of Adam Williams, Lourdes Health Network PACT team members visited with Williams in person one hundred and seventeen times. PACT members called Williams one hundred and sixty-nine times, although we do not know on how many occasions Lourdes employees spoke with Williams on the phone.

From the first day of his release from Eastern State Hospital on March 17, 2011, Adam Williams missed meetings with Lourdes or untimely cancelled appointments. Lourdes PACT team members did not report these violations of the court order to the

Crisis Response Unit and did not insist that Williams attend the meetings. Rather,

Lourdes allowed Williams to set the terms of his meetings and allowed him to cancel

meetings for no reason. On April 7, 2011, Lourdes PACT member Dana Oatis expressed

concern for Williams "since he hasn't been seen much since being discharged from

[Eastern]." CP at 262.

On April 21, 2011, Ann Rayment, a Lourdes Health Network nurse, drove Adam

Williams to a blood test and explained to Williams that his less restrictive alternative

release could be revoked if he abused drugs or refused treatment and medications.

Rayment offered to contact Lourdes chemical dependency case worker, Suzanne Kieffer,

with whom Williams could arrange Narcotics Anonymous meetings.

On June 2, 2011, Adam Williams met with Suzanne Kieffer. Kieffer wrote in her

notes:

> I did remind Adam that marijuana is more expensive and more
> potent now all these years later. He said "I know." He then looked at me
> and made a funny face and said, "I mean I do not know" and he smiled. I
> asked [Williams] to please just be real around me that he does not need to
> lie or pretend just [because] I am the [chemical dependency] person and he
> said "I will try but I do not know that will be hard to do sometimes it is best
> to not tell anyone what you are doing." I asked him where that got him in
> the past and he said, "True it got me Eastern."

CP at 273-74. The record lacks any information that Kieffer arranged for Williams to

attend Alcoholics Anonymous or Narcotics Anonymous meetings as the less restrictive

alternative order demanded. Kieffer believed that Williams' use of methamphetamine

8

contributed to his mental illness. On times she visited Williams, Keiffer knew he was using drugs. The drugs' influence caused Williams to reject Keiffer's assistance and rendered the meetings difficult for Keiffer.

On June 14, 2011, Adam Williams underwent a urinalysis as part of community supervision for another felony. The test showed the presence of marijuana. Williams granted Lourdes access to his community supervision records, but Lourdes probably did not obtain a copy of the urinalysis report.

On July 19, 2011, a Lourdes Health Network team member visited Adam Williams at his home in order to refill his medication box. The team member discovered that Williams missed doses of medication. On July 22, Suzanna Kieffer traveled to Williams' home for a scheduled visit, but Williams was not home. Keiffer telephoned Williams and his phone went straight to voicemail. Lourdes staff spoke with Williams by phone on July 25 and 26, and Williams stated he was with family. Lourdes team members continued to attempt personal contact with Williams through July 28, in part to refill his medications, but could not locate him.

On July 29, 2011, Suzanne Kieffer visited Adam Williams' home, but Williams was again absent. Kieffer later spoke with Williams' brother, who told Keiffer that he had not seen Williams for a week and police also searched for him. Keiffer received a call from Williams' parole officer, David Garcia, who informed her that he had attempted

9

contact with Williams for three weeks. Lourdes Health Network did not notify Crisis Response Unit of Williams' disappearance.

On July 31, 2011, Adam Williams called his father from a payphone. The father detected Williams to be in a disorganized, angry, anxious state. Williams informed his father that he had been living on the street and sleeping under a bridge. He had stopped taking medications and had relapsed with methamphetamine. Williams' parents took him to Kadlec Medical Center emergency room where doctors treated Williams for dehydration and dangerously low sodium and potassium levels. Williams expressed suicidal thoughts to medical center staff.

Lourdes Health Network PACT team member Suzanne Kieffer visited Adam Williams at Kadlec Medical Center and authored a report following her observation of Williams in the hospital:

> [H]e [Williams] said "I was hiding from PACT because I do NOT want to go back to ESH [Eastern State Hospital] and I have not taken my meds for about 9 days or so and I do not give a flying fuck I have been using crystal meth just flying high, but I am done with that I dumped about 3 ounces down the drain" . . . [T]hey [Kadlec Medical Center] could not medically release him so he was asked to stay. He agreed but when the charge nurse came in to give him an IV and give him something to make him sleep he told her "Fuck you bitch you are not going to stick no needles in me fuck all you guys I am out of here[.]" I stepped out of his way and he ran out of the ER [emergency room] yelling at top of his lungs. [Williams'] Dad followed him so [sic] somewhere about Les Schwab by the hospital Dad and security catch [sic] up with him and he pushes dad. . . . [Police returned him to the hospital.] He was doing good [sic] so the cops left and mom and dad went to get something to eat in the hospital and apparently Adam ripped his IV out of his arm and took off again. . . . I called [the Bi-

10

County Crisis Response Unit] and they said they could not do anything as he was not suicidal or threatening anyone else. . . . I left the hospital, as there was nothing that I could do. Do [sic] to his violent behavior I would not even attempt to detain him, transport him, nor be in the same room alone with him.

CP at 315.

Cameron Fordmeir, a Crisis Response Unit DMHP, visited Kadlec Medical Center on August 1, 2011, and performed an evaluation of Williams. Fordmeir either did not try to contact Lourdes Health Network or was unable to contact Lourdes prior to evaluating Williams.

During a deposition, Cameron Fordmeir explained that, when evaluating someone for revocation of a less restrictive alternative release, he determines if the mental health patient meets criteria under the Involuntary Treatment Act. At the time of his August 1 evaluation of Williams, Fordmeir knew that Williams was subject to a less restrictive alternative order, had been diagnosed with paranoid schizophrenia, had not taken his medication in weeks, and had used methamphetamines. In a written evaluation of Adam Williams, Cameron Fordmeir wrote: "Client denies [suicidal ideation] and contracts for safety." CP at 369. In the evaluation, Fordmeir determined that Williams was not a serious risk of harm to himself or others and that he was not gravely disabled.

In the weeks following hospitalization at Kadlec Medical Center, Adam Williams' condition improved. On October 6, 2011, Lourdes nurse Michelle Aronow prescribed Concerta for Williams, Concerta being a stimulant to treat symptoms of Attention Deficit

11

Disorder. Aronow warned Williams of the dangers of abusing stimulants.

At a medication management appointment on November 23, 2011, with Michelle Aronow, Adam Williams admitted to taking a month's worth of Concerta in a week. Williams acknowledged abuse of the medication. Williams told Aronow that "at times he believes that he can read people's minds, and . . . that he was Jesus Christ in the past." CP at 389. Williams admitted that he did not take his other medications regularly. Following this revelation, Aronow chose to take Williams off of Clozaril, a powerful anti-psychotic, and prescribe Abilify.

On December 27, 2011, Theresa Chandler, a Lourdes Health Network nurse, met with Adam Williams at his home. After the meeting Chandler wrote in a file note:

> I sat down on his bed as it is also his couch to fill his med box. Adam was very sexually inappropriate, he layed [sic] behind me, put his hand on my back, ran his hand up and down my back and down my arm, "how are you doing?" I turned to look at him and tell him that wasn't ok for him to touch me like that. . . . I asked him if he was using any kind of other drugs right now because he appeared to be very laid back and mellow. He said, "just heroin." I wasn't sure i heard him right and i asked him to repeat what he just said, he laughed and said, "no I'm just kidding, I'm not on heroin. You want to look at my eye's [sic]". I did look at his pupils and they appeared to be normal. I sat back down on the bed and was putting his medication bottles away and he sat next to me grabbing at me again saying "how are you doing" this time he tried to touch my breast. . . .

CP at 427 (some capitalization omitted).

On December 28, 2011, at a medication management appointment, Lourdes Health Network nurse Michelle Aronow discussed, with Adam Williams, his sexual

12

preoccupation and reminded him that he cannot make sexual comments to or sexually touch a Lourdes staff member. Williams indicated that he understood, but said that "[he] should be able to express [his] feelings." CP at 431. Aronow's notes from December 28 indicate: "if his behavior continues he may need to look at male staff only." CP at 432. Aronow reminded Williams that he must take his medications regularly or she would contact the Bi-County Crisis Unit.

On January 6, 2012, Adam Williams met with Lourdes Health Network licensed mental health counselor Cynthia Wallace. Wallace's notes from the meeting read:

> He spent the entire session leering at mhp [wallace]. . . . Adam stated I know 3 things about myself, "I need a women [sic], I love methamphetimines and I am an instrument of god." . . . He reported that "my grandma is part of a plot against me." Adam went onto [sic] describe how she is part of a conspiracy to do him harm. [Wallace] challenged him on this, asking him to provide evidence. He had non [sic] but remains convinced. Adam also reported that he is not getting along with his dad, "I hate him."

CP at 442 (some capitalization omitted).

On January 11, 2012, Adam Williams and Linda Schroeder, a Lourdes Health Network PACT member, met with State Division of Vocational Rehabilitation (DVR) staff to discuss employment. Schroeder wrote concerning the drive to the division office:

> I drove Adam to DVR for a meeting. On the way there I reminded him that he has an appointment tomorrow with Steve [a Lourdes employee]. Adam said "I'm not coming. I don't want to see any of the men from the PACT team. . . ." I told him we couldn't force him since *this is a volunteer program* but it would be beneficial to him.

13

CP at 445. (emphasis added). Schroeder wrote about the meeting with the Division of

Vocational Rehabilitation:

> I tried to reason with him [Williams] a little bit so that Jim [James Bischoff, a vocational counselor employed by DVR] might work with him in the future. Adam calmed for a minute and then got annoyed again and stood up and said "I'm done and out of here." Both Jim and Adrianna [a DVR employee] were concerned at Adam's hostile mood and dark looks he was giving and the fact that I was transporting him from the meeting. Jim asked me to call him when I dropped Adam off. When we got in the car, Adam said "I'm sorry but that guy was making me mad. I know he was trying to trick me and I wasn't going to stand for it." Adam's shoulder twitched every so often and his head jerked. I mentioned to Adam about the CD [chemical dependency] group tomorrow at 10 and he said "I don't like that group. I don't [like] the lady that runs it." I asked him why and he said "she's an alien and has lost her life. I haven't lost mine because God saved me." . . . Adam is displaying anti-social tendencies and staff suspect he is using street drugs.

CP at 446.

Following the January 11 meeting with Adam Williams and Linda Schroeder,

DVR counselor James Bischoff wrote:

> Adam was disheveled, poor complexion, appeared agitated, gave very little eye contact, and would not respond much to questions or small talk. Linda from the Lourdes PACT team was present as well as Adriana from Service Alternatives. In my office, Adam stated that he does not want to work. . . . When VRC [I] . . . said we would close his DVR case he became more agitated. He made a statement saying that he wanted to leave and VRC escorted him out and he became more paranoid and then almost ran out of the building. Adam is not currently in a stable state of mind to work and his DVR case is being closed.

CP at 448.

On January 16, 2012, Lourdes Health Network nurse Teresa Chandler e-mailed

concerns about Adam Williams' behavior to the rest of the Lourdes PACT team:

> Adam came in this morning to get his check and i was supposed to fill his med box. Adam had the excuse that his med box "dropped on the ground and shattered, my meds went all over the place, I had to throw them away.". . . He is obviously not taking them. He has been getting odder every day. Today he looked horrible . . . Dishevled, smelly, and Linda said he smelled like alcohol. He became very agitated when I pointed out it was obvious he is not taking his medication and hasn't been for quite some time. . . . *How long are we going to let this go before we revoke him?* I thought early detection and intervention was our goal. He's getting so much worse. . . . *I don't want to be any where in a room alone with him. Help.* . . Teresa

CP at 450. (some capitalization omitted) (emphasis added).

On January 18, 2012, Linda Schroeder retrieved Adam Williams from his

home and drove him to the Lourdes Health Network office for a medication

management appointment with Michelle Aronow and for an evaluation by the

Crisis Response Unit to evaluate whether he should be detained. Due to bad

weather, however, the Unit cancelled its portion of the appointment. Schroeder

wrote of her observations of Williams during their drive to the Lourdes office:

> The first thing he said to me was "How's you and your husband doing? Are you getting it on?" I immediately put a stop to that conversation going any further and he apologized. . . . I asked Adam if he took his medications today and he said "I took some. I only take them when he tells me I need them." I said he? and he said "You know God. God will tell me when I need to take my meds and when he does I take them." . . . Adam's appearance is [disheveled] and clothes are dirty. He has several sores around his mouth.

CP at 452.

Despite the Crisis Response Unit's cancellation of its meeting on January 18, Michelle Aronow spoke with Adam Williams about medication management. Aronow observed:

> The patient [Adam Williams] presented to the facility casually dressed, however, somewhat disheveled. Continues to not shave or wash his hair or clean his clothes. He continues to reference this as wanting to feel scum on his body and does not believe in using soap any longer. He says cleanliness is next to Godliness inside not on the outside. . . . I asked where the medication boxes were, and he said that they broke, and he does not know where they are at this time.
>
> . . . .
>
> . . . I continue to get complaints of his sexual inappropriate discussions with female staff. He does admit that he is attracted to "all the female staff here." When I asked if he has any thoughts of hurting anyone female staff, he said "oh my God, no, I would never do that." "I just really really attracted to females, not males Michelle you know that just females."[sic]
>
> . . . .
>
> . . . I explained to the patient quite categorically in regards to his least restrictive alternative and that taking his medications and not using any drugs or alcohol was very important because I do not want to see him hospitalized or in jail if at all possible I would like to keep him out stable in the community, so he can continue to attempt to go to work or go to school or whatever he may want to do. I explained to him, however, though if he continues with the specific statements that he is making and not taking the medications or using drugs, then I believe that his insight and judgment will continue to deteriorate and then he would need to speak with the Crisis Response Unit people, which I explained who they were and that they can make the decision whether or not to put him back in the hospital. He stated an understanding, and he stated he did not want to talk to these people.

CP at 455-56.

16

After Adam Williams' medication management appointment on January 18, 2012, Linda Schroeder chauffeured Adam Williams to the bank and grocery store. Schroeder noticed that Williams quietly spoke and laughed to himself while shopping. On returning to Williams' home, Schroeder espied a pile of over fifty black capsules on the floor. Williams walked around the capsules. Schroeder did not ask what the capsules contained, but she gave Williams medication boxes and left the home.

In its brief, Lourdes Health Network writes that, on January 23, 2012, Adam Williams went to the PACT office and had the competency to state that someone he knew needed help and he wanted to know how to make this happen. The citation given for this statement of fact is a trial court brief, not an affidavit or declaration.

On January 25, 2012, Lourdes PACT member Linda Schroeder requested Lourdes nurse Michelle Aronow meet with Adam Williams. Aronow visited Williams at the Lourdes office and observed that Williams appeared disheveled and dirty, with long dirty fingernails. Williams told Aronow that he had "been with the creator" that the "creator does favors for me and for other people," and that he had been using "ice," a form of crystal methamphetamine. CP at 470. Williams stated that he still took his medications, but he did not bring his medication box for a refill. Aronow reminded Williams that he must take his medications and refrain from using drugs in order to comply with the less restrictive alternative order. Aronow asked Williams to submit to a blood test and urine screen, but Williams declined. He commented: "I don't want to have my blood out

there." Williams admitted that he would test positive for methamphetamine use. CP at 470. Aronow then received a call regarding another Lourdes patient.

Lourdes nurse Michelle Aronow and Crisis Response Unit mental health professional Kathleen Laws present differing versions of events that transpired later on January 25, 2012. According to Aronow, she called the Crisis Response Unit and requested an evaluation of Williams and another patient. Aronow wrote in a chart note:

> I wanted Kathleen from CRU to see the patient due to the noncompliance as best as we can tell in regard to his medication as well as his continued drug use. He also has been making some sexual statements to staff, which is making many of the female staff here quite unsettled and obviously fearful of this particular patient if in fact he is not taking his medication, and I felt that CRU needed to at least evaluate him and decide if his LRA needed to be revoked.

CP at 471-72. Aronow also wrote in her notes that Kathleen Laws and she met and discussed Williams, after which Laws evaluated Williams for twenty to thirty minutes. During the meeting, Williams denied wanting to hurt anyone.

According to Kathleen Laws, she journeyed to the Lourdes Health Network office, on January 25, to evaluate another patient and, on her travel to Lourdes, a Lourdes employee requested that she remind Adam Williams of conditions for a less restrictive alternative placement. Nevertheless, Laws' contemporaneous notes state: "PACT Team's – Michelle Aronow – requested an eval." CP at 97. Laws' notes record she spent thirty minutes of "client time." CP at 95. In her deposition, Laws testified that her entire meeting with Williams lasted only five minutes and the remaining "client time"

18

referred to travel and note taking. CP at 354. Laws declared that, at the time of the meeting, she lacked a history for Williams and she did not meet with Aronow about him.

On January 26, 2012, Adam Williams returned to Lourdes Health Network to refill his medication box. A Lourdes nurse called Michelle Aronow and said that "he was acting very strange—reading a Bible aloud and talking to someone who was not there. . ." CP at 656. Aronow then called Crisis Response Unit employee Kathleen Laws. The two differ as to the content of the phone conversation. Aronow wrote

> called CRU and talked to Kathaleen [sic] Laws as she was the one who [ ] spoke with him yesterday in my office. I told her he had in fact come back to the office and filled his med box—but the nurse had observed some bizarre behavior of him talking to someone that wasn't there and reading the Bible aloud. . . . [She said he] evidenced [good] judgment by coming back and getting his med box filled, but talking to himself is typical with his diagnosis. [Aronow] stated to her again that staff continue to be fearful of him and [she did] not want him to be alone with a female staff as Linda was to take him shopping this Friday. She agreed that was a good plan to have only males. [Aronow] said [she] would take a male staff out with [her] Monday am and see if he has been taking his medication. She agreed. She said—then if he has not been and you want him revoked—we will revoke him as he has been explained what is in the LRA—

CP at 656.

Kathleen Laws testified that Michelle Aronow called to notify her that Adam Williams thanked her for Laws speaking to him. Aronow repeated Williams' comment that he would obey his less restrictive alternative order.

According to Lourdes Health Network's brief, PACT team member Linda Schroeder had thirteen contacts with Adam Williams between December 29, 2011, and January 26, 2012.

On January 27, 2012, Adam Williams visited his grandmother Viola Williams' house. He then believed himself to be Lucifer Grand Am Dynasty and that God directed him to kill his grandmother. He brutally murdered his grandmother in a manner too bizarre and egregious to describe. A court later found him not guilty of first degree murder by reason of insanity. During his psychological evaluation following the murder charge, the doctor wrote: "The medications he was taking at the time of the murder represented a total failure in treatment." CP at 408.

## PROCEDURE

Sherrie Lennox, as personal representative of the Estate of Viola Williams, sues Lourdes Health Network and Benton-Franklin County Crisis Response Unit. Both defendants filed summary judgment motions.

In opposition to Lourdes Health Network's and Crisis Response Unit's motions for summary judgment motion, Sherrie Lennox's expert witness, Matthew Layton, signed a declaration listing conduct of both Bi-County Crisis Unit and Lourdes he concluded was "grossly negligent." CP at 547. Layton is a board certified psychiatrist and professor at the College of Medical Sciences at Washington State University. He reviewed the records of the Crisis Response Unit and Lourdes Health Network.

20

Pertinent portions of the declaration read:

4. From 2000 to 2008, I was the Medical Director of Spokane Mental Health, a community mental health organization with multiple outpatient clinics and inpatient evaluation and treatment facilities. In that capacity, I oversaw the psychiatric administration of a Program for Assertive Community Treatment (PACT). In addition, the Designated Mental Health Professionals were employees of Spokane Mental Health. The DMHPs made decisions about detention of individuals under the Involuntary Treatment Act. As Medical Director, I oversaw work of the DMHPs and was part of their decision making process.

. . . .

8. The August 1, 2011 evaluation of Adam Williams by DMHP Cameron Fordmeir was grossly negligent.

a. Mr. Fordmeir failed to adequately review CRU's own notes on Mr. Williams. CRU's notes showed that Mr. Williams posed an increased risk of violence when he is off his medication. The CRU notes also showed that he was at high risk to victimize his parents and to be a threat to others.

b. Mr. Fordmeir did not apply the criteria for revocation of a conditional release under a Less Restrictive Alternative but rather evaluated Mr. Williams as though he was not already subject to the Involuntary Treatment Act. The criterion to revoke a LRA does not require a showing of imminent danger. It only requires a showing there is an increased likelihood of serious harm.

c. Mr. Fordmeir failed to review the treatment notes from the PACT team. Had he done so, he would have learned that Adam Williams has very poor judgment, was refusing to participate in substance abuse treatment, had used street drugs before this hospitalization, failed to appear for his lab work, and was not consistently taking his medication.

d. Mr. Fordmeir also failed to evaluate Adam Williams' risk of harm to other people. While, Mr. Fordmeir asked Mr. Williams if he was going to hurt himself or someone else and Mr. Williams said no, the literature shows that this is ineffective in determining risk.

e. Even with the information Mr. Fordmeir did have, he should have revoked Mr. Williams' LRA. Mr. Williams violated the terms of his LRA and this violation led to an increased risk of serious harm to himself. Mr. Williams had admitted to violating his LRA. He was using street drugs and failing to take his medication. He was hospitalized for potassium depletion,

the result of his methamphetamine and cocaine use. . . . Revocation of the LRA and hospitalization at that time would have stabilized him.

9. Kathleen Laws January 25, 2011 evaluation of Mr. Williams was grossly negligent.

a. Ms. Laws failed to use the appropriate standard for evaluating Mr. Williams' for a revocation of his LRA. Like Mr. Fordmeir, Ms. Laws used the criteria for evaluating Mr. Williams as though he was not already detained under the Involuntary Treatment Act rather revocation of an LRA.

b. Ms. Laws' deposition testimony is that she spent only five minutes with Mr. Williams. This is not sufficient time to do a competent evaluation. Ms. Laws testified in her deposition that she did not know Mr. Williams' diagnosis at the time of the evaluation.

c. Ms. Laws' deposition testimony indicates that she was only there to remind Mr. Williams to take his medication. This is an abdication of her responsibility to make an independent evaluation of Mr. Williams. The expectation is that a DMHP conduct an evaluation and use his or her clinical judgment to see if a revocation should occur.

. . . .

e. Ms. Laws failed to review the notes of the PACT team. Ms. Laws did not know of Mr. Williams' violent history or history of noncompliance with the terms of his LRA. . . .

f. Ms. Laws should have revoked Mr. Williams when he declined to take the do the [sic] "Gain-SS Form."

g. Ms. Laws erred in taking Adam Williams at his word that he would follow the conditions of his LRA, when he had made these promises multiple times in the past.

10. The PACT Team was grossly negligent in their supervision, monitoring and reporting of Adam Williams' compliance with his LRA.

a. The PACT team failed to inform CRU that Mr. Williams regularly violated every term of his LRA. These violations included using methamphetamines and other street drugs, repeatedly failing to take his medication, failing to attend substance abuse treatment, and revoking his release of information to contact his family members.

b. Michelle Aronow, ARNP, on the PACT team improperly monitored Mr. Williams' medications. In November, 2011 she discontinued Mr. Williams' Clozaril because he was noncompliant. Clozaril is a medication that should not be started and stopped abruptly. Literature shows that Clozaril is far more effective for patients like Mr. Williams and in combination with other medications improved his

22

psychotic symptoms and decreased his risk for violence enough to allow his conditional release back to the community. Mr. Williams' psychotic symptoms had been stabilized at Eastern State and for several years on Clozaril. Discontinuing the Clozaril was not medically indicated. Once she did discontinue the Clozaril, Ms. Aronow should have tapered the Clozaril rather than abruptly discontinuing it. Mr. Williams became increasingly psychotic after this medication change. Ms. Aronow failed to increase the dosage of the new medication or increase the monitoring of the medications as Mr. Williams psychotic symptoms steadily increased. The combination of the change in medication and the use of street drugs caused Mr. Williams to rapidly decompensate.

c. The PACT team misunderstood the nature of Mr. Williams' participation in the program. The PACT team viewed this participation as voluntary. Mr. Williams was on a LRA because he was found unable and/or unwilling to voluntarily consent to treatment.

d. The PACT team failed to notify CRU when Mr. Williams became sexually preoccupied, developed command hallucinations, and attempted to sexually assault two female staff members.

e. The PACT team knew that Mr. Williams was dangerous. Female staff were afraid to be alone with Mr. Williams. . . . Yet, PACT failed to notify CRU of this dangerousness.

f. The PACT team failed to notify CRU of Mr. Williams' rapid decompensation, and increased psychosis. The medical record is clear that the PACT team should have requested revocation by not later than January 6th, 2014. His paranoid delusions and his erratic behavior in a meeting with Cynthia Wallace show that he was so decompensated he needed to be in the hospital.

. . . .

12. CRU had the legal authority to detain Mr. Williams on January 25 and January 26, 2012. . . . Had CRU detained [sic] Adam Williams would have been in the hospital on January 27, 2012, the date Viola Williams was murdered. Further when the case came before a judge, it is my experience that judges usually order detention and continued detention when requested by the DMHP. . . .

CP at 543-47.

In a deposition, Lourdes Health Network asked Dr. Matthew Layton:

23

> Q. And sometimes that requires a judgment decision whether you ask for a revocation of an LRA or decide not to?
> A. It may, yes.

CP at 897.

The Crisis Response Unit filed a motion to strike Dr. Matthew Layton's declaration. The Unit argued that the declaration improperly offered a legal opinion. The Unit also argued that the court should not consider Layton's testimony, in paragraph twelve of his declaration, as to how a judge usually rules.

The trial court struck those portions of Matthew Layton's declaration referring to gross negligence because of the conclusory nature of the testimony. The trial court also struck Layton's testimony, in paragraph twelve, concerning how a judge usually rules. The trial court granted both Lourdes Health Network's and the Crisis Response Unit's summary judgment motions. The court concluded that affidavits established that both defendants exercised more than slight care in that they had frequent contact with Adam Williams.

## LAW AND ANALYSIS

### Matthew Layton Declaration

Sherrie Lennox contends the trial court erred in striking portions of her expert's declaration. We do not consider the declaration of Matthew Layton important to the resolution to this appeal. Therefore, we do not address this assignment of error.

Lourdes Health Network Summary Judgment

*Gross Negligence*

On appeal, Lourdes Health Network contends that the undisputed evidence shows it was not grossly negligent. Also, Lourdes argues that Lennox cannot establish proximate cause. The first issue is whether questions of fact exist as to any gross negligence by Lourdes Health Network. We answer in the affirmative.

Sherrie Lennox claims that Lourdes Health Network should have recommended and encouraged the Crisis Response Unit to revoke Adam Williams' least restrictive alternative status and return him to involuntary commitment at a hospital. When the plaintiff claims the mental health professional should have detained the patient, the plaintiff is claiming the professional should have involuntarily committed the patient. *Volk v. DeMeerleer*, 184 Wn. App. 389, 424, 337 P.3d 372 (2014), *review granted*, 183 Wn.2d 1007, 352 P.3d 188 (2015). Under such circumstances, RCW 71.05.120 controls and the mental health professional is entitled to immunity under the statute. *Volk v. DeMeerleer*, 184 Wn. App. at 424.

RCW 71.05.120 bestows incomplete immunity on Lourdes Health Network. RCW 71.05.120 provides, in pertinent part:

> [No] county designated mental health professional, nor state, a unit of local government, or an evaluation and treatment facility shall be civilly or criminally liable for performing duties pursuant to this chapter with regard to the decision of whether to admit, discharge, release, administer antipsychotic medications, or detain a person for evaluation and treated:

PROVIDED, That such duties were performed in good faith and without gross negligence.

RCW 71.05.120(1). An exception in the statute is gross negligence.

As a result of assuming Adam Williams' outpatient care, Lourdes Health Network undertook certain duties ungrammatically outlined in former RCW 71.05.340 (2009).

Those duties included:

(3)(a) If the hospital or facility designated to provide outpatient care, the designated mental health professional, or the secretary determines that:
(i) A conditionally released person is failing to adhere to the terms and conditions of his or her release;
(ii) Substantial deterioration in a conditionally released person's functioning has occurred;
(iii) There is evidence of substantial decompensation with a reasonable probability that the decompensation can be reversed by further inpatient treatment; or
(iv) The person poses a likelihood of serious harm.
Upon notification by the hospital or facility designated to provide outpatient care, or on his or her own motion, the designated mental health professional . . . may order that the conditionally released person be apprehended and taken into custody and temporarily detained in an evaluation and treatment facility. . . .
(b) The hospital or facility designated to provide outpatient treatment *shall notify* the secretary or designated mental health professional when a conditionally released person fails to adhere to terms and conditions of his or her conditional release or experiences substantial deterioration in his or her condition and, as a result, presents an increased likelihood of serious harm. The designated mental health professional . . . shall order the person apprehended and temporarily detained in an evaluation and treatment facility. . . .

Former RCW 71.05.340 (2009) (emphasis added).

Deviations from the duties under RCW 71.05.340 must be judged against the gross

26

negligence standard. "Gross negligence" is negligence substantially and appreciably greater than ordinary negligence. *Nist v. Tudor*, 67 Wn.2d 322, 331, 407 P.2d 798 (1965). "Gross negligence" also means the failure to exercise slight care. *Nist v. Tudor*, 67 Wn.2d at 331. "Gross negligence" does not mean the total absence of care, but care substantially or appreciably less than the quantum of care inhering in ordinary negligence. *Nist v. Tudor*, 67 Wn.2d at 331; *Johnson v. Spokane to Sandpoint, LLC*, 176 Wn. App. 453, 460, 309 P.3d 528 (2013).

Lourdes Health Network forwards six decisions in which Washington courts rejected argument on appeal that a defendant's conduct constituted gross negligence. *O'Connell v. Scott Paper Co.*, 77 Wn.2d 186, 460 P.2d 282 (1969); *Johnson v. Spokane to Sandpoint, LLC*, 176 Wn. App. 453; *Whitehall v. King County*, 140 Wn. App. 761, 167 P.3d 1184 (2007); *Estate of Davis v. Dep't of Corr.*, 127 Wn. App. 833, 113 P.3d 487 (2005); *Kelley v. Dep't of Corr.*, 104 Wn. App. 328, 17 P.3d 1189 (2000); and *Boyce v. West*, 71 Wn. App. 657, 862 P.2d 592 (1993). In *Boyce v. West*, Boyce neither alleged gross negligence in her complaint, nor provided the court with any evidence supporting an allegation of gross negligence. Boyce presented excerpts of the deposition testimony of her expert. In those excerpts, the expert expressed his opinion that the defendant committed negligence, but said nothing about gross negligence.

In *Kelley v. Department of Corrections*, Kevin Ingalls assaulted Deborah Kelley while he was on community custody status. Kelley argued Ingalls' correction officer

should have returned Ingalls to prison because of community custody conditions violations. The only evidence presented was that Ingalls was not in violation of conditions, except for one violation unknown to the community corrections officer. Kelley also contended that the corrections officer failed to make all the required field contacts with Ingalls. Nevertheless, the undisputed evidence showed that any additional contacts would not have prevented the assault.

In *Whitehall v. King County*, Serena Whitehall sued King County for negligently supervising a misdemeanant. This court affirmed a summary judgment dismissal of the claim. Probation officers consistently met with the probationer and checked to determine if he met his probation conditions. On one occasion when the officers learned that the probationer could not meet a condition, the officers moved a court to modify probation terms, and a court granted the motion.

In *Estate of Davis v. Department of Corrections*, the estate did not claim that the defendant acted grossly negligently, but argued immunity did not apply under RCW 71.05.120 because the defendant did not assess the patient under the Involuntary Treatment Act. Lourdes Health Network mistakenly contends this court held the defendant, in *Davis*, not to be grossly negligent. We held the defendant to owe no duty.

We believe the facts read in a light most favorable to Sherrie Lennox are more analogous to the facts in *Bader v. State*, 43 Wn. App. 223, 716 P.2d 925 (1986) and *Petersen v. State*, 100 Wn.2d 421, 671 P.2d 230 (1983). In *Bader v. State*, this court

28

reversed summary judgment in favor of a treatment center in a suit for failure to detain a mental health patient. We concluded that the jury could have found the center grossly negligent when it knew that its patient missed appointments, refused to take his medicine, exhibited paranoid behavior, threatened violence, and violated conditions of his release from a hospital. The center failed to report the patient's condition to authorities.

In *Petersen v. State*, Larry Knox, while under the influence of drugs, sped through a red light, hitting and injuring Cynthia Petersen. Earlier, while at Western State Hospital, Knox was diagnosed as having a schizophrenic reaction to the use of "angel dust." His treating physician knew that he was potentially dangerous, that he disliked taking prescribed medication, and that he was likely to relapse. Nonetheless, the physician chose not to petition the court for commitment and released him. Five days after release from Western State Hospital, Knox drove into Petersen. Based on these facts, the court affirmed a jury finding of gross negligence. Though the court decided *Petersen* before enactment of RCW 71.05.120, gross negligence was the applicable standard because Petersen presented no expert testimony.

Appellate courts review summary judgment de novo. *Heath v. Uraga*, 106 Wn. App. 506, 512, 24 P.3d 413 (2001). Summary judgment is appropriate when there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. CR 56(c). The burden is on the party moving for summary judgment to demonstrate there is no genuine issue of material fact. *Folsom v. Burger King*, 135

29

Wn.2d 658, 663, 958 P.2d 301 (1998). All facts and reasonable inferences are viewed in the light most favorable to the non-moving party. *Folsom*, 135 Wn.2d at 667. Where different competing inferences may be drawn from the evidence, the issue must be resolved by the trier of fact. *Johnson*, 176 Wn. App. at 457-58.

Under the facts favorable to Sherrie Lennox, Lourdes Health Network saw Williams deteriorating. Lourdes knew Williams thought he conversed with God, was sexually preoccupied, believed his grandmother engaged in a conspiracy against him, and used methamphetamines. Lourdes understood that Williams had a history of violence. Lourdes knew that he groped one of its employees, and hit his father while under their supervision. Lourdes observed that Williams skipped appointments and rejected his medications. In short, Lourdes Health Network knew that Adam Williams violated the conditions of his less restrictive alternative release and that he was dangerous, but never requested Crisis Response Unit to revoke the less restrictive alternative status. Although Lourdes contends its employee's testimony only meant to state Williams' use of its services was voluntary, the trier of fact could conclude that Lourdes considered Williams' participation voluntary rather than compelled by court order that should be revoked if Williams violated conditions of the order.

On January 16, 2012, Lourdes Health Network nurse Teresa Chandler e-mailed concerns to other Lourdes employees pleading for help, because she did not wish to be present with Adam Williams alone. Chandler questioned: "How long are we going to let

30

this go before we revoke him?" CP at 450 (some capitalization omitted). An employee requested an evaluation from the Crisis Response Unit, but still no Lourdes' employee requested that the unit revoke the release.

Lourdes Health Network contends that, because it provided some care and because it had scores of contact with Adam Williams, it must not be grossly negligent. Lourdes may believe the provision of some care necessarily means the care it provided was more than slight care. We disagree. "Gross negligence" does not mean the total absence of care. Simply engaging in contact with the patient does not exclude the possibility of gross negligence. Also, the more contact Lourdes had with Williams, the more knowledge it gained of the need to revoke and the more opportunities arose to encourage the Crisis Response Unit to revoke the less restrictive alternative release.

Lourdes Health Network contends that Sherrie Lennox's own experts admit that whether Lourdes should have taken actions to commence the process of having Adam Williams detained was a judgment call. On this assumed fact, Lourdes contends that a mere error in judgment does not constitute negligence, let alone gross negligence. We reject this argument because Lourdes misstates the testimony of Dr. Matthew Layton. Layton testified that sometimes the decision to revoke a less restrictive alternative status involves a judgment call. He did not testify that Lourdes' failure under these circumstances entailed a judgment call.

Lourdes Health Network claims that Matthew Layton testified that Lourdes need

31

not have taken any steps to seek institutionalization of Adam Williams until January 6, 2012. Lourdes again misstates the testimony. Dr. Layton testified that Lourdes should have taken these steps at least by January 6.

Lourdes Health Network argues that it met any duty by asking the Crisis Response Unit to evaluate Adam Williams. This argument fails to note the extensive knowledge Lourdes possessed concerning the danger posed by Williams and his repeated violations of the less restrictive alternative court order. The argument also fails to note Lourdes staff members, including mental health counselors, could have strongly recommended to the Crisis Response Unit to revoke the release, which recommendation likely would lead to notification of the court under RCW 71.05.340(3)(d).

### *Proximate Cause*

Lourdes Health Network argues that, as a matter of law, Sherrie Lennox cannot establish proximate cause. Lourdes contends there is no evidence that shows that, but for Lourdes' failure to recommend detaining Williams on January 6, 2012, he would not have killed Viola Williams. Lourdes also argues that the Crisis Response Unit's alleged gross negligence is a superseding cause severing the causal chain.

Proximate cause has two parts: cause in fact and legal cause. *Taggart v. State*, 118 Wn.2d 195, 225, 822 P.2d 243 (1992). Factual cause is based on a physical connection between an act and an injury. *Schooley v. Pinch's Deli Market, Inc.*, 134 Wn.2d 468, 478, 951 P.2d 749 (1998). Legal causation rests on considerations of policy and common

32

sense as to how far the defendant's responsibility for the consequences of its actions should extend. *Taggart*, 118 Wn.2d at 226. Lourdes argues the absence of both.

Lourdes Health Network contends that the evidence of any alleged negligence prior to January 6, 2012, lacks relevance because Dr. Matthew Layton testified that Lourdes need not have sought revocation of the less restrictive alternative placement until then. As already noted, Lourdes misstates the testimony of Dr. Layton. Layton testified that Lourdes should have sought institutionalization by January 6, not beginning on January 6.

Sherrie Lennox contends Lourdes Health Network's ongoing failure to perform its duties was the cause of Viola Williams' death. This argument draws from all of Lourdes' interactions with Williams. Establishing cause in fact involves a determination of what actually occurred and is generally left to the jury. *Schooley*, 134 Wn.2d at 478.

Lourdes Health Network's superseding cause argument fails for at least two reasons. First, the actions of Lourdes and the Crisis Response Unit occurred concurrently. Second, the Unit's failure of revocation was foreseeable in light of Lourdes' acts and omissions.

For purposes of causation, Lourdes claims that Sherrie Lennox is bound by a contention in her complaint that the Crisis Response Unit was grossly negligent. While a party is generally bound by statements of fact in her complaint, allegations of gross negligence are not statements of fact, but rather legal conclusions. *Neilson v. Vashon*

33

*Island Sch. Dist.*, 87 Wn.2d 955, 958, 558 P.2d 167 (1976); *Thompson v. King Feed &*
*Nutrition Serv. Inc.*, 153 Wn.2d 447, 463, 105 P.3d 378 (2005). Legal conclusions are
treated differently than statements of fact. *See e.g. Rodriguez v. Loudeye Corp.*, 144 Wn.
App. 709, 717-18, 189 P.3d 168 (2008). Lennox cannot be estopped from arguing in the
alternative nor from arguing concurrent tortfeasors, particularly in light of our later ruling
that facts do not support gross negligence on the part of the Crisis Response Unit.

Lourdes Health Network contends that gross negligence is not foreseeable as a
matter of law. Therefore, according to Lourdes, the Crisis Response Unit's alleged gross
negligence is a superseding cause. Lennox posits that the Crisis Response Unit's failure
to revoke Adam Williams' less restrictive alternative release was foreseeable from
Lourdes' failure to insist on revocation. Lennox also claims that this appeal involves
multiple defendants and an indivisible injury, and, therefore, a superseding cause analysis
is inapplicable.

There can be more than one proximate cause of an injury. Tortfeasors may act
independently and breach separate duties, yet the conduct of both may concur to produce
the injury. *Stephens v. Omni Ins. Co.*, 138 Wn. App. 151, 182-83, 159 P.3d 10 (2007),
*aff'd*, 166 Wn.2d 27, 204 P.3d 885 (2009). Concurrent negligence of a third party does
not break the chain of causation between original negligence and the injury. *Travis v.*
*Bohannon*, 128 Wn. App. 231, 242, 115 P.3d 342 (2005). If the defendant's original
negligence continues and contributes to the injury the intervening negligence of another

34

is an additional cause. *Travis v. Bohannon*, 128 Wn. App. at 242. It is not a superseding

cause and does not relieve the defendant of liability. *Travis v. Bohannon*, 128 Wn. App.

at 242. Only intervening acts which are *not* reasonably foreseeable are deemed

superseding causes. *Anderson v. Dreis & Krump Mfg. Corp.*, 48 Wn. App. 432, 442, 739

P.2d 1177 (1987).

The Supreme Court, in *Campbell v. ITE Imperial Corp.*, 107 Wn.2d 807, 812-13,

733 P.2d 969 (1987), listed factors courts should consider when determining whether an

intervening cause is a superseding cause:

> [T]he relevant considerations under Restatement (Second) of Torts
> §442 (1965) are, *inter alia*, whether (1) the intervening act created a
> *different type of harm* than otherwise would have resulted from the actor's
> negligence; (2) the intervening act was *extraordinary* or resulted in
> extraordinary consequences; (3) the intervening act *operated independently*
> of any situation created by the actor's negligence.

The *Campbell* court quoted *Restatement (Second) of Torts* §449 (1965):

> [i]f the likelihood that a third person may act in a particular manner
> is . . . one of the hazards which makes the actor negligent, such an act
> whether innocent, negligent, intentionally tortious, or criminal does not
> prevent the actor from being liable for harm caused thereby.

*Campbell*, 107 Wn.2d at 813.

No Washington case directly addresses whether gross negligence is unforeseeable

as a matter of law. Therefore, in order to support its contention, Lourdes forwards

foreign law. Nevertheless, Washington's *Campbell* analysis is sufficient to determine

whether gross negligence is always unforeseeable. In *Campbell*, the court quoted the

35

*Restatement (Second) of Torts*, which declares that intervening criminal conduct of a third party can be foreseeable. It would be illogical to conclude gross negligence of a third party to be less foreseeable than criminal acts of a third party. Thus, we reject Lourdes' contention that gross negligence is unforeseeable as a matter of law.

Since gross negligence can be foreseeable, the question is whether facts on appeal support gross negligence's foreseeability. The record includes facts to support the conclusion that, if Lourdes requested revocation, the Crisis Response Unit would have revoked the less restrictive alternative release. Lourdes never made that request. A reasonable jury could find that Lourdes' conduct was a proximate cause. Facts also support the Crisis Response Unit and Lourdes Health Network to be concurrent tortfeasors. Both parties chose not to act, and that inaction resulted in an indivisible harm: the death of Viola Williams.

Bi-County Crisis Response Unit Summary Judgment

We previously reviewed the summary judgment principles and rules of gross negligence. Based on the foregoing, we conclude insufficient evidence supports a claim for gross negligence against the Crisis Response Unit. The Unit had some, but limited, contact with Adam Williams. The Spokane court order directed Lourdes Health Network, not the Crisis Response Unit, to monitor Williams. Lourdes never recommended revocation of the less restrictive alternative release. In *Bader v. State*, 43 Wn. App. 223 (1986) and *Petersen v. State*, 100 Wn.2d 421 (1983), only the entity that

36

directly oversaw the treatment of the patient was held responsible under gross negligence.

Dr. Matthew Layton criticizes Crisis Response Unit designated mental health professionals Cameron Fordmeir and Kathleen Laws for deficient evaluations. According to Layton, Fordmeir employed a wrong test for revocation of the less restrictive alternative placement. Fordmeir failed to review all of Lourdes records. Nevertheless, he reviewed Kadlec Medical Center records and spoke with Adam Williams' father. Whereas, we agree Fordmeir's evaluation could be found negligent, we do not discern the absence of slight care or gross negligence. Williams acted appropriately for weeks after Fordmeir's evaluation.

Lourdes Health Network's nurse Michelle Aronow and Crisis Response Unit's designated mental health professional Kathleen Laws disagree concerning events surrounding Laws' January 25, 2012 evaluation of Adam Williams. Laws claims she was only asked to remind Adam Williams to follow the court order. Aronow indicates that she asked Laws to evaluate Williams for revocation of his release. Laws says the meeting lasted five minutes. Aronow says it lasted thirty minutes. The two disagree as to the amount of information Aronow provided Laws. Both agree that there had not been a previous appointment to perform an evaluation. According to Laws, she went to Lourdes Health Network that day to evaluate someone else. Aronow did not insist to Laws that the lesser restrictive alternative order be revoked. Aronow's notes do not indicate that she explained the full history of Williams to Laws. During the meeting, Williams denied

37

wanting to hurt anyone. Again, we do not observe an absence of slight care.

Since we hold that insufficient facts support any finding that the Crisis Response Unit engaged in gross negligence, we need not address whether any conduct of the unit proximately caused the death of Viola Williams.

CONCLUSION

We reverse the summary judgment dismissal of defendant Lourdes Health Network. We affirm the summary judgment dismissal of defendant Crisis Response Unit.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Fearing, J.

Fearing, C.J.

WE CONCUR:

Korsmo, J.

Siddoway, J.